[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 1.]

THE STATE OF OHIO, APPELLEE, *v*. WILLIAMS, APPELLANT.

[Cite as *State v. Williams*, 1997-Ohio-407.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 95-2572—Submitted October 9, 1996—Decided June 11, 1997.)

APPEAL from the Court of Appeals for Summit County, No. 16418.

————————————

{¶ 1} Defendant-appellant, William J. Williams, Jr., controlled the drug trafficking at the Kimmelbrooks housing project in east Youngstown, Ohio. After an extended absence from the area, appellant returned to find that Alfonda R. Madison, Sr., William L. Dent, Eric Howard, and others had taken over the drug trade at the Kimmelbrooks project. Appellant wanted to regain control of the drug business, so he decided to rob and kill Madison and the others.

{¶ 2} Appellant had three juvenile accomplices: his sixteen-year-old girlfriend, Jessica M. Cherry; her sixteen- or seventeen-year-old brother, Dominic M. Cherry; and Dominic Cherry's seventeen-year-old "cousin" (*i.e.*, best friend), Broderick Boone. On August 27, 1991, the appellant bought walkie-talkies at a Radio Shack store. The devices had a combined microphone-earphone earpiece that left the user's hands free. The appellant also bought batteries and duct tape. The appellant, Dominic, and Broderick later tested the walkie-talkies.

{¶ 3} Before the murders, the appellant outlined his plan to his three accomplices. During this meeting, the appellant drew interior and exterior diagrams of Madison's house. The appellant later ordered Dominic to burn these, but Dominic burned only one diagram. In addition, the appellant supplied each accomplice with a gun. The appellant purchased Jessica's gun from a neighbor.

{¶ 4} On September 1, 1991, Jessica met with Madison and discussed a drug deal. Later that night, the appellant and his three accomplices arrived at

Madison's home by car. The appellant armed the three juvenile accomplices with guns and a walkie-talkie and sent them inside, while he waited outside with a walkie-talkie. Once inside, the three accomplices drew their guns on Madison. Then, after receiving word via walkie-talkie that the situation was secure, the appellant, armed with a semiautomatic, entered the house carrying a duffel bag containing handcuffs, duct tape, and gloves. Inside, the appellant handcuffed and bound Madison and put tape over his mouth.

{¶ 5} Thirty to forty-five minutes later, Theodore Wynn, Jr., a recently discharged Air Force sergeant, came to the door, looking for Madison and Howard, who were roommates. Jessica answered the door and told Wynn that Madison was not home and Howard was asleep. As Wynn walked back towards his car, the appellant told Jessica to call Wynn back into the house because Wynn could identify them. Inside the house, the appellant held Wynn at gunpoint and handcuffed him.

{¶ 6} Upon the appellant's orders, Jessica walked to a pay phone and called and asked for Dent for the purpose of luring him to the house. When Dent arrived with Howard, the appellant and his accomplices ambushed them and forced them to lie down in the bathroom. The appellant strangled Madison and Wynn, and then instructed Jessica to turn up the stereo. Going from room to room, the appellant shot each of the four victims in the head with Madison's gun.

{¶ 7} The group left Madison's home, but the appellant, according to Jessica, went back in "to make sure they were all dead." Later, back at the appellant's apartment, he embraced his juvenile accomplices and rewarded them with drugs. The appellant warned them not to tell anyone what they had done or he would kill them.

{¶ 8} The next day, September 2, 1991, the appellant and Jessica were driving to pick up appellant's son in Youngstown when another car rammed theirs and the people in the other car shot at them. Jessica and the appellant fled the scene.

When Jessica and the appellant returned to the vicinity of the accident, officers transported them to the Youngstown Police Department and later released them after questioning them about the traffic accident. Later that night, the appellant, Jessica, Dominic, and Broderick fled to Pennsylvania. The appellant and the three juveniles returned to the Youngstown area and parted company.

{¶ 9} On September 24, 1991, Dominic turned himself in, and gave a statement about the murders. Later, officers arrested Jessica and Broderick, and the latter also gave statements. Following their arrests, Jessica, Dominic, and Broderick were held at the Mahoning County Juvenile Justice Center ("JJC").

{¶ 10} The appellant was arrested in connection with the murders. Shortly after being arrested, he escaped from jail on October 15, 1991. While the appellant remained a fugitive from justice, a Mahoning County Grand Jury indicted him on four counts of aggravated murder, four counts of kidnapping, and one count of aggravated burglary.

{¶ 11} On January 12, 1992, the armed appellant and two other accomplices, Paul R. Keiper, Jr., and a juvenile named Eric Fields, appeared at the JJC. The three deceived a receptionist and were permitted to enter. Once inside, the appellant held the receptionist and a deputy sheriff hostage, demanding to see Jessica, Dominic, and Broderick. After lengthy negotiations, the appellant surrendered to authorities. At trial, Keiper testified that the appellant planned to kill the three juveniles because he knew that they had made statements to the police regarding the murders.

{¶ 12} The Mahoning County Grand Jury reindicted the appellant on twelve counts of aggravated murder, four counts of kidnapping, and one count of aggravated burglary. In addition, each aggravated murder charge included two felony-murder death specifications and one death specification for multiple murder. On the appellant's motion, the court transferred venue to Summit County.

3

{¶ 13} Jessica, Dominic, and Broderick all entered into plea agreements with the Mahoning County Prosecutor's Office. All three pled guilty to delinquency by reason of complicity to aggravated murder, complicity to aggravated burglary, and complicity to kidnapping. All three testified against the appellant.

{¶ 14} A jury convicted the appellant on all counts and specifications. The trial court merged the twelve aggravated murder counts into four and the three specifications per count into a single multiple-murder specification. Following the sentencing hearing, the jury recommended death for each aggravated murder. The trial judge sentenced the appellant to death, and the court of appeals affirmed.

{¶ 15} The cause is now before this court upon an appeal as of right.

_____

*James A. Philomena*, Mahoning County Prosecuting Attorney, and *Michele G. Cerni*, Assistant Prosecuting Attorney, for appellee.

*John Juhasz* and *Mary Jane Stephens*, for appellant.

_____

LUNDBERG STRATTON, J.

{¶ 16} We have reviewed the appellant's nine propositions of law, independently weighed the evidence relating to the death sentence, balanced the aggravating circumstance against the mitigating factors, and compared the sentence to those imposed in similar cases. As a result, we affirm the convictions and sentences of death.

I

ALLEGED JUROR MISCONDUCT

{¶ 17} In Proposition of Law I, the appellant argues that the conduct of the prospective jurors deprived him of his constitutional right to an impartial jury, guaranteed by both the United States and Ohio Constitutions. Thus, the appellant argues, the trial court should have granted his motion for mistrial during voir dire.

The appellant claims that the trial court erred by improperly curtailing inquiry into prospective jurors' misconduct, and by refusing to conduct an investigation or allow counsel to investigate. Included in the appellant's allegations is that prospective jurors concealed prior knowledge of the case, rumors about the case, and anxiety concerning court security.

{¶ 18} A claim of juror misconduct must focus on the jurors who were actually seated and not those excused. *Ross v. Oklahoma* (1988), 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80. Thus, to establish a constitutional violation in this situation, the appellant must demonstrate that one of the jurors seated was not impartial. Further, unless a juror is challenged for cause, he or she is presumed to be impartial. *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682, 695.

{¶ 19} Appellant claims that two individuals who served on the jury, Joann Eddleman and Martha Forsyth, concealed their misconduct on voir dire and contends that this court should therefore presume they were biased. A court may infer bias if it finds *deliberate* concealment; however, if the concealment was unintentional, the appellant must show that the juror was actually biased. *Zerka v. Green* (C.A.6, 1992), 49 F.3d 1181, 1184-1186.

{¶ 20} Because appellant did not challenge Forsyth or Eddleman on the ground that they had concealed information, appellant waived any errors involved. *State v. Greer* (1988), 39 Ohio St.3d 236, 247, 530 N.E.2d 382, 397. However, we will examine these allegations for plain error.

{¶ 21} On voir dire the judge asked Eddleman if she knew anything about the case, to which she replied she did not. However, according to prospective juror Janet Parsons, Eddleman told her that a Youngstown resident had informed her that the case "involved drugs" and the authorities had been unable to find the defendant. However, Eddleman told Parsons that "she [Eddleman] didn't know if that was true." Parsons admitted she was only "half listening" and "wasn't paying that much attention" to Eddleman. The appellant argues that Eddleman concealed her alleged

conversation with the person from Youngstown. However, this court does not find that Eddleman deliberately concealed the conversation because she had previously indicated that she did not know whether those rumors were true. Thus, her voir dire response was truthful—she did not know anything about the case. She was not asked whether she had discussed the case with anyone. Therefore, Eddleman's answers create no presumption of bias.

{¶ 22} Appellant claims Forsyth may have concealed a conversation with prospective juror John Gombaski. Gombaski, who was excused for cause, allegedly overheard a conversation between court employees about the case. Gombaski allegedly told two other prospective jurors what he had heard. While he did not recall which two prospective jurors he told, at that point in voir dire there were only four possibilities. When the judge read the four names, Gombaski said Forsyth "might" ring a bell. The judge asked Forsyth whether she had heard any discussion about the case in the courthouse. She replied that she had not, although the venire had speculated about what type of questions would be asked. A review of Gombaski's and Forsyth's voir dire does not provide a basis for finding that Forsyth concealed information. Therefore, we presume no prejudice regarding Forsyth.

{¶ 23} Janet Smith was the other possible prospective juror who served on the jury and with whom Gombaski may have spoken. The trial court questioned Smith about whether she had heard or seen any pretrial publicity about the case. She replied that she had not. Further, the trial court asked her whether she had heard comments about the case or discussed the case with other jurors. Again, she replied that she had not and that she did not know anything about the case other than what the judge told her in the courtroom. The other two prospective jurors who might have spoken with Gombaski did not serve on the jury. Having reviewed for plain error, we find none.

**{¶ 24}** The appellant claims that juror Margaret Rohwedder was biased because she allegedly overheard discussion about security and possible retaliation. When questioned on voir dire, Rohwedder indicated that she had heard no such discussion. Because appellant presented no proof that she lied, there is no merit to the bias claim. The remaining jurors who the appellant alleged were biased did not sit on the jury.

**{¶ 25}** The appellant also argues that the trial judge did not sufficiently inquire into the extent and effect of the alleged juror misconduct. However, the scope of voir dire is within the discretion of the trial court and varies depending on the circumstances of each case. *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913, 920. The trial judge and counsel questioned all of the jurors allegedly involved in the misconduct. Upon review of the voir dire, we do not find that the trial judge unreasonably or arbitrarily restricted examination or investigation into the preconceptions of the prospective jurors. Therefore, the trial court acted within its discretion in overruling the appellant's motion for mistrial. Accordingly, we reject Proposition of Law I.

II

ALLEGED JUROR PREFERENCE FOR THE DEATH PENALTY

**{¶ 26}** In appellant's second proposition of law, he claims that the trial court wrongly overruled nine challenges for cause concerning alleged pro-death-penalty jurors. The standard for determining whether a prospective juror may be excluded for cause due to his or her views on capital punishment is whether that prospective juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (Emphasis deleted.) *Wainwright v. Witt* (1985), 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841, 849, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589. This court specifically adopted that standard in *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the

syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, where we held that voir dire would constitute reversible error only upon a showing that the court abused its discretion. *Id.,* 17 Ohio St.3d at 178-179, 17 OBR at 418, 478 N.E.2d at 990.

**{¶ 27}** The United States Supreme Court has held in *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 2229-2230, 119 L.Ed.2d 492, 502-503, that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." The rationale behind this is that "a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception." (Footnote omitted.) *Id.* at 735-736, 112 S.Ct. at 2223, 119 L.Ed.2d at 507.

**{¶ 28}** Many times during voir dire in death penalty cases, prospective jurors are asked for the first time to face their views about the death penalty. Often, they have not defined in their own minds what their views are, and they are forced to define their beliefs amidst extremely leading questioning from both parties. Some have very strongly held views, but have never had to define them within the context of following the law. It is the duty of the trial judge to sort through their responses and determine whether the prospective jurors will be able to follow the

8

law. We find that the trial court permitted this appellant to question the prospective jurors both before and after the court's questions. Therefore, we find that the trial judge properly complied with the requirements of *Morgan v. Illinois*.

{¶ 29} Appellant alleges that the trial court abused its discretion in denying nine challenges for cause. Of the nine challenges, the appellant excused five prospective jurors (Frances Scanlon, Magda Subecz, V.F. Allen, Khim Standen, and Richard Mains) through peremptory challenges. The appellant exhausted his peremptory challenges. Of the four prospective jurors remaining, two (Edna Lewis and Linda Tanski) were excused for other reasons, and the two remaining jurors (Patricia Camp and Joann Eddleman) were seated.

{¶ 30} The two allegedly biased prospective jurors who ultimately sat on the jury were Camp and Eddleman. Juror Camp did not automatically favor the death penalty, but the appellant argues that she was overly concerned about the possibility of parole. A juror's impartiality is not impaired simply because that juror opposes parole for convicted murderers. Further, when the trial judge explained the death penalty phase and the law involved, Camp stated that she could consider all of the possible penalties and return the appropriate verdict. She also stated that she did not think that all murderers should be executed. Thus, we do not find that it was error for the trial judge to overrule the appellant's challenge for cause regarding Camp.

{¶ 31} Eddleman was the other juror who was challenged for cause by the appellant and who ultimately sat on the jury. Eddleman vacillated in her responses to questions concerning the death penalty. When questioned by the prosecutor, she agreed that she could follow the court's instructions and that she understood that the death penalty was not an automatic punishment. When questioned by the defense, she agreed that even given the three choices of death, life with parole eligibility after twenty years, and life with parole eligibility after thirty years, she would choose death. Yet, in response to the judge, she indicated that she

understood the balancing process for aggravating circumstances and mitigating factors and agreed that she could participate in that process, weigh the evidence fairly, and make the appropriate recommendation.

{¶ 32} The transcript reveals that Eddleman appeared to contradict herself. It is difficult from reading the transcript to determine whether Eddleman was overstating her beliefs concerning the death penalty to defense counsel, or understating them to the judge and prosecutor.

{¶ 33} *Morgan* held that answers to "general questions of fairness or impartiality" cannot negate a statement by the prospective juror that he or she would automatically vote for death. *Morgan*, 504 U.S. at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 506. However, the trial judge's questions were more than general inquiries regarding a juror's ability to be fair and impartial. Instead, the judge fully explained the penalty stage, the law of mitigation and aggravation, and the corresponding penalties. By the end of voir dire, Camp and Eddleman fully understood that an automatic death penalty vote is inconsistent with the law. Thus, when they said they could follow the law, they were not unaware that "maintaining [their] dogmatic beliefs about the death penalty would prevent [them] from doing so." *Morgan*, 504 U.S. at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 507. Indeed, they had already said they could set their views aside.

{¶ 34} Voir dire, like the entire litigation process, is inherently adversarial. With both parties attempting to push a prospective juror into a certain position in order to remove him or her from the jury, it is the job of the trial judge to determine which statements of the prospective juror reflect that individual's true state of mind and ability to follow the law. Hence, in the give and take of voir dire, it is often necessary for the trial judge to step in and provide some neutral, nonleading instructions and questions in an attempt to determine whether the prospective juror can actually be fair and impartial. The transcript reveals only the words spoken in the courtroom.

**{¶ 35}** The United States Supreme Court has held that "deference must be paid to the trial judge who sees and hears the juror." *Witt*, 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853. Although *Witt* was a habeas corpus case, the principle is equally sound in this case. A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion. *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920. The trial judge had the benefit of observing Eddleman's demeanor and body language, while we do not. Finding no abuse of discretion, we therefore defer to the trial judge's discretion to determine whether Eddleman could indeed follow the law and be fair and impartial.

**{¶ 36}** The appellant argues that the trial judge improperly overruled his challenges for cause regarding seven other prospective jurors, five of whom the appellant eventually excused through peremptories. While it is true, regarding the right to an impartial jury, that the proper focus is on the jurors who were seated, see *Broom, supra,* if the defense peremptorily excuses the biased prospective juror, but the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial. *Hartnett v. State* (1885), 42 Ohio St. 568, paragraph four of the syllabus; *State v. Tyler* (1990), 50 Ohio St.3d 24, 30-31, 553 N.E.2d 576, 586-587.

**{¶ 37}** The reason for this rule is that an error by the trial judge in overruling a challenge for cause forces the defendant to use a peremptory on a prospective juror who should have been excused for cause, giving the defendant fewer peremptories than the law provides. Consequently, this court need not consider the challenges to prospective jurors Lewis and Tanski because the appellant did not need to use a peremptory challenge on either, as both were excused for other reasons.

**{¶ 38}** As for the remaining jurors, the appellant exhausted his peremptories in removing them. We will therefore examine the voir dire of the other five prospective jurors (Scanlon, Subecz, Allen, Standen, and Mains). First, the appellant points to Scanlon, who told defense counsel she would automatically vote for the death penalty if the appellant "willfully and intentionally" murdered someone. Similarly, Subecz told defense counsel that death is always the appropriate penalty for intentional murders lacking "excuse or justification." However, defense counsel did not explain to those prospective jurors the legal meaning of the terms "willful," "intentional," "excuse," or "justification."

**{¶ 39}** Second, the appellant points to prospective jurors Allen, Standen, and Mains, who would require the appellant to show why he should not receive a death sentence. But later, when the law was more fully explained to them, each prospective juror stated that he or she could follow the law.

**{¶ 40}** It was the task of the trial judge to observe the prospective jurors and determine whether after explanation they could indeed follow the law and be fair and impartial. We find that the trial judge did not abuse his discretion in denying the appellant's challenges for cause. Accordingly, we reject Proposition of Law II.

## III

## SUFFICIENCY OF EVIDENCE

**{¶ 41}** In Proposition of Law III, the appellant argues that his convictions were not supported by sufficient evidence and that the verdict was against the manifest weight of the evidence. In our review of the evidence, our standard is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. After a thorough review of the evidence, we find it to be sufficient.

{¶ 42} The appellant's accomplices in the murders all testified against him at trial. The appellant challenges their testimony as inconsistent, inaccurate, and biased due to their plea agreements with the state. All three testified that they saw the appellant shoot Dent and Howard. None of the accomplices saw the appellant shoot Wynn, but all three saw the appellant walk into the bedroom where Wynn was held, and all three then heard a shot.

{¶ 43} Jessica testified that she saw the appellant strangling Madison in the kitchen. Later, Jessica heard the appellant say that he was going to kill Madison, saw him enter the kitchen where he was restraining Madison, heard the appellant say to Madison, "I'll see you in hell," and heard a gunshot. Jessica testified that the appellant told her to turn up the stereo to drown out the shots. During the planning stages, Broderick heard the appellant state his plan to kill Madison. During the murders, Broderick, who was guarding Wynn in the bedroom, also heard the appellant shoot Madison. Dominic testified that he saw the appellant walk into the kitchen area and shoot Madison in the back of the head.

{¶ 44} This testimony, if believed, was enough by itself to convict. Further, the events that occurred on the evening of January 12, 1992 at the Mahoning County Juvenile Justice Center are strong evidence of the appellant's guilt. After the appellant escaped from the Mahoning County Jail, he purchased a police uniform, armed himself, and used deception to gain entry to the JJC, allegedly with the intent to kill his three juvenile accomplices to the murders. Paul Keiper, one of the appellant's accomplices on January 12, testified that the appellant told him that he planned to kill the three juveniles. Further, Jerome E. Gibson, a fellow prisoner while the appellant was awaiting trial at the Summit County Jail, testified that the appellant told him he had intended to kill his three juvenile accomplices with "explosives and guns" at the JJC.

**{¶ 45}** Physical evidence included duct tape and electrical cord recovered from the victims, the recovered murder weapon, slugs removed from the victims, and spent shell casings.

**{¶ 46}** While it is true that there were inconsistencies in the testimony of the three juvenile witnesses, this evidence must be viewed in the light most favorable to the state. This court will not resolve evidentiary conflicts or determine credibility. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825. The jurors had the opportunity to fully observe and hear the testimony of each witness. The defense pointed out inconsistencies in their testimony during cross-examination and in closing argument. It was up to the jurors to weigh these inconsistencies and assess the witnesses' credibility. When all the evidence is viewed in the light most favorable to the prosecution, the jury could reasonably have found the evidence sufficient to prove beyond a reasonable doubt that the appellant committed the crimes charged. Accordingly, we reject Proposition of Law III.

IV

OTHER-ACTS EVIDENCE

**{¶ 47}** The appellant pled guilty before trial to an escape from the Mahoning County Jail and to the unlawful entry into the JJC. At trial, the prosecution introduced evidence about the appellant's armed entry into the JJC. In Proposition of Law IV, the appellant argues that this evidence violated Evid.R. 404(B) because the evidence was not needed to prove motive or intent and because it was offered solely to inflame the jury and to bolster the credibility of the three juvenile witnesses. Further, the appellant argues that the evidence should have been excluded under Evid.R. 403(A) because the prejudicial impact substantially outweighed its probative value.

**{¶ 48}** Ohio Evid.R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 49} Other acts may prove identity by "establishing a *modus operandi* applicable to the crime with which a defendant is charged." *State v. Lowe* (1994), 69 Ohio St.3d 527, 531, 634 N.E.2d 616, 619. In this case, the incident at the JJC is evidence of *modus operandi*. It established a "behavioral fingerprint" linking the appellant to the crime due to the common features shared by both events. *Id.* In both instances, the appellant sent others into the building first to create a diversion and to hold the victims at gunpoint, while the appellant waited outside until his accomplices had secured the situation. In both instances, he used at least one juvenile accomplice. In both instances, the appellant dressed in dark clothing from head to toe and wore a mask and gloves. In both instances, the appellant carried automatic firearms. In both instances, the appellant handcuffed some of his victims' hands behind their backs and confined them in the bathroom. These examples demonstrate a similar method of operation, thereby establishing identity.

{¶ 50} Further, we find that the evidence of the appellant's entry into the JJC showed the appellant's intent to kill the three juvenile witnesses. Evidence of conduct designed to impede or prevent a witness from testifying is admissible as showing consciousness of guilt. See, *e.g., United States v. Cirillo* (C.A. 2, 1972), 468 F.2d 1233, 1240; 2 Wigmore, Evidence (Chadbourn Rev. 1979) 133, Section 278. The three juveniles were the only eyewitnesses to the crime. The appellant had discovered that the three juveniles had agreed to testify against him. The appellant had told at least two persons, Keiper and Gibson, that he planned to kill the juveniles.

{¶ 51} Thus, evidence of the incident at the JJC was admissible to show consciousness of guilt. " 'It is today universally conceded that the fact of an

accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' " *State v. Eaton* (1969), 19 Ohio St.2d 145, 160, 48 O.O.2d 188, 196, 249 N.E.2d 897, 906, vacated on other grounds (1972), 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750, quoting 2 Wigmore, Evidence (3 Ed.) 111, Section 276.

**{¶ 52}** In addition, the appellant argues that it was error for the trial court to refuse to give a limiting instruction. However, because the entry into the JJC presented substantive evidence of *modus operandi* and consciousness of guilt, we do not find that the court was required to give a limiting instruction. Finally, we find that the probative value substantially outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury pursuant to Evid.R. 403(A) and *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267, 274. Accordingly, we reject Proposition of Law IV.

V

ALLEGED PROSECUTORIAL MISCONDUCT

**{¶ 53}** In Proposition of Law V, the appellant argues that the prosecutor improperly vouched for the credibility of the state's three juvenile eyewitnesses. The appellant claims that the prosecutor specifically elicited from the three juvenile witnesses that the Mahoning County Prosecutor's Office could determine the truthfulness of the juveniles' statements to the police in deciding whether to go forward with the plea arrangements. The appellant failed to object to this line of questioning by the state. Therefore, the issue is waived except for plain error, and the appellant must demonstrate that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

**{¶ 54}** It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. *State v.*

*Thayer* (1931), 124 Ohio St. 1, 176 N.E. 656; *State v Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883.  However, the evidence does not establish that the prosecutor was "vouching" for the witnesses, but rather that he was exploring the basis of the plea arrangements.  In the case at bar, the state asked Jessica about her plea bargain at the beginning of her testimony.  She acknowledged, "They gave me a plea bargain to testify against Flip Williams; and if I went back on my plea bargain, then I would be retried as an adult and sentenced."  The appellant did not object to the elicitation of the terms of the plea agreement.  In fact, it was the appellant who on cross-examination first introduced the idea that the truthfulness of Jessica's statements would be determined by the prosecutor's office.  Jessica replied that she could not remember whether part of the agreement required the truth of the testimony to be determined by the prosecutor's office.

{¶ 55} When the state questioned Broderick about his plea bargain, the state specifically asked whether, as part of the plea, there was a plea agreement that Broderick would "give a truthful statement under oath as to what had occurred during the kidnappings and killings of William Dent, Eric Howard, Alfonso [*sic*] Madison and Theodore Wynn, Junior, including the entire course of conduct involved, [and that] the truthfulness of that statement would be determined by the Mahoning County Prosecutor's Office."  Again, the appellant did not object.  Finally, the same questioning occurred with respect to Dominic, and again, the appellant did not object.

{¶ 56} We find that any error that may have occurred from these questions was not outcome-determinative, and therefore not plain error.  While the three juvenile witnesses were the only eyewitnesses to the murders, the jury clearly could have believed Jessica even if the state had not highlighted her plea bargain.  Similarly, the jury could have believed Dominic and Broderick even if it had not heard about the "truthful statement" clauses in their plea agreements.  Indeed, given the defense efforts to turn the plea agreements against the state, it is difficult to say

whether the agreements helped or hurt the witnesses' credibility. See *United States v. Arroyo-Angulo* (C.A.2, 1978), 580 F.2d 1137, 1146; *People v. Manning* (1990), 434 Mich. 1, 18, 450 N.W.2d 534, 541. Moreover, we note that the "truthful statement" clauses did not provide that the prosecutor's office would determine the truthfulness of the witnesses' *testimony*. Rather, the clauses provided that the plea bargains would fail if the prosecutors did not believe their sworn statements. Therefore, the appellant failed to demonstrate that the outcome clearly would have been otherwise if the jury had not learned about the truthful-statement clauses. Accordingly, we reject Proposition of Law V.

VI

MOTION TO SUPPRESS

{¶ 57} After the murders, on September 2, 1991, the appellant was involved in a car crash in Youngstown, Ohio. Apparently, individuals in the other car shot at the appellant and Jessica, and all parties fled the scene. Shortly thereafter, Jessica returned to the scene of the accident. Jessica told Officer Marvin Hunter that she had been a passenger in one of the cars involved in the accident.

{¶ 58} Half an hour later, the appellant returned to the scene. The appellant told Hunter that he had been driving a Pontiac when a Cadillac rammed them and the people in the Cadillac shot at him. Appellant told Hunter that he did not shoot back, but instead, jumped out of the Pontiac and ran. Hunter was ready to arrest the appellant for leaving the scene of an accident, in violation of R.C. 4549.02, when Hunter's sergeant ordered him to take the appellant to the station for questioning. Hunter advised the appellant that the detectives would like to see him relative to a shooting. Hunter told the appellant that he could arrest him but would not, and asked the appellant if he would go to the police station. The appellant agreed and was driven to the station.

{¶ 59} Sometime after arriving at the station, Detective Gerald Maietta and Detective William Blanchard read the appellant his *Miranda* rights, and had the

appellant sign a copy of the *Miranda* form. The appellant agreed to an atomic absorption test on his hands to determine whether he had recently fired a gun. The appellant left the station after he signed a summons for leaving the scene of an accident. In Proposition of Law VI, the appellant argues that this detention was not supported by probable cause, and, therefore, the positive test result should have been suppressed as fruit of the poisonous tree. See, generally*, Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

{¶ 60} The evidence appears to show that the appellant went voluntarily to the police station and agreed to submit to the atomic absorption test. However, because these facts are not entirely clear, even assuming that the appellant had actually been arrested, the arrest was justified by probable cause. R.C. 4549.02 requires a driver involved in a collision on a public street to stay at the scene until he or she has given his or her name, address, and registration number to the other driver, to any injured party, or to a police officer. The appellant told Officer Hunter that he had been driving during the collision and had fled. Despite the fact that the appellant was being shot at when he fled, Officer Hunter still had probable cause to arrest the appellant for a violation of R.C. 4549.02. An arrest made on probable cause does not become unreasonable under the Fourth Amendment to the United States Constitution just because police had the ulterior motive of investigating another crime for which they lacked probable cause. *Dayton v. Erickson* (1996), 76 Ohio St.3d 3, 665 N.E.2d 1091. In fact, Officer Hunter followed up on his probable cause for leaving the scene of an accident by requiring the appellant to sign a summons charging him with that offense. Therefore, under either scenario, the results of the atomic absorption test were admissible. Accordingly, we reject Proposition of Law VI.

VII

LIMIT ON CROSS-EXAMINATION

{¶ 61} In Proposition of Law VII, the appellant claims that the trial court improperly limited his cross-examination of Dominic Cherry. On cross-examination, Dominic testified that the police advised him of his *Miranda* rights on September 24 and October 23, 1991, and that he had understood them and waived them. Defense counsel handed Dominic a copy of a motion to suppress, filed by Dominic's attorney in Mahoning County Juvenile Court. The motion sought to suppress all of Dominic's statements "in connection with his arrest and investigation into the crimes which occurred on or about September 2, 1991, in the City of Youngstown * * * ." The motion, as proffered by the appellant, claimed that police obtained those statements "in violation of Defendant's Constitutional rights as further set forth in the case of *Miranda v. Arizona* * * *." The trial court sustained the state's objection to the use of the motion by the defense.

{¶ 62} Appellant claims this ruling was error. The appellant claims the evidence was admissible pursuant to Evid.R. 608(B), which permits inquiry on cross-examination of specific instances of a witness's conduct to attack the witness's character for truthfulness or untruthfulness.

{¶ 63} We find that the trial court did not err in sustaining the state's objection to the use of the motion to suppress. Evid. R. 608(B) permits inquiry on cross-examination into specific instances of the conduct of a witness for the purpose of assessing the witness's character for truthfulness or untruthfulness. The filing of the motion was not clearly probative of Dominic's character for truthfulness or untruthfulness as required by Evid.R. 608(B). Dominic's testimony was not necessarily inconsistent with the motion. Dominic testified that he was "informed" of, "understood," and "waived" his *Miranda* rights. The motion, as proffered by the appellant, claimed that police obtained Dominic's statements "in violation of Defendant's Constitutional rights as further set forth in the case of *Miranda v.*

*Arizona*." There could have been several technical or legal issues supporting a motion to suppress beyond the mere fact of whether officers read the *Miranda* warnings to the appellant. The vague language of the motion does not reveal the factual detail necessary to make a determination whether the motion was probative of Dominic's character for truthfulness or untruthfulness.

{¶ 64} Moreover, defense counsel was in effect trying to use the motion as a prior inconsistent statement by Dominic. However, it was not Dominic's statement. Dominic did not write it or sign it. Under Evid.R. 608(B), Dominic could be impeached with his own conduct, including his own prior inconsistent statements, but not with motions made by his attorney. Therefore, we find that Dominic's motion to suppress was not admissible under Evid.R. 608(B).

{¶ 65} Moreover, we reject the appellant's argument under Evid.R. 616, which permits a party to prove a witness's "[b]ias, prejudice, interest, or any motive to misrepresent." The motion had no tendency to show bias on Dominic's part.

{¶ 66} Finally, the appellant claims that the trial court's ruling violated the Sixth Amendment guarantee of the right of an accused to confront the witnesses called against him. See *Pointer v. Texas* (1965), 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923. Because the motion was not probative of Dominic's credibility, we reject the appellant's Sixth Amendment claims. Accordingly, we overrule Proposition of Law VII.

VIII

CONSTITUTIONALITY

{¶ 67} Appellant challenges the constitutionality of Ohio's death penalty statutes in his eighth proposition of law. We summarily reject this challenge. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Ohio's death penalty scheme is constitutional. See, *e.g.*, *State v. Davis* (1992), 63 Ohio St.3d 44, 50, 584 N.E.2d 1192, 1197; *State v. Scott* (1986), 26 Ohio St.3d 92, 109, 26 OBR 79, 93-94, 497 N.E.2d 55, 69. Accordingly, we reject Proposition of Law VIII.

IX

GRAND JURY SELECTION

{¶ 68} In Proposition of Law IX, the appellant claims that the trial court should have quashed the indictment due to irregularities in the grand jury selection process. The appellant contends that the Mahoning County Jury Commissioners' Office failed to comply with the procedures for jury selection established in R.C. 2313.08, 2313.12, and 2313.13 as made applicable to grand juries by R.C. 2939.02 and 2939.03.

{¶ 69} R.C. 2313.08 requires the jury commissioners in each county to make up an annual jury list, certify it, file it in their office before the beginning of each jury year, and certify and file a duplicate list in the office of the clerk of the court of common pleas. R.C. 2313.12 requires jury commissioners to keep a record of all proceedings before them or in their office, and of all persons exempted and the time and reasons for the exemptions. R.C. 2323.13 establishes the procedures for postponing service, temporarily excusing service, or discharging a juror from service.

{¶ 70} In the case at bar, the jury commissioners did not file a certified duplicate of the jury list with the clerk's office. The appellant claims that the indictment was invalid because the grand jury venire was selected from a jury list that was not filed with the clerk's office. The appellant cites *McGill v. State* (1877), 34 Ohio St. 228, for the proposition that any irregularity that materially affects a substantial right of the defendant and prevents him or her from being tried by a legally constituted jury requires that the verdict be set aside and that a new trial be granted.

{¶ 71} The court of appeals found that the failure to follow the procedures mandated by R.C. 2313.01 *et seq.* did not require the court to reverse an otherwise valid conviction. We agree. This court has recognized that the failure to follow the procedure set forth in R.C. 2313.01 *et seq.* for the selection of grand jury venires

does not *ipso facto* invalidate an otherwise valid conviction of a defendant. *State v. Fulton* (1991)*,* 57 Ohio St.3d 120, 124, 566 N.E.2d 1195, 1201.

**{¶ 72}** We find that the irregularity in question did not materially affect a substantial right of the appellant. In *State v. Puente* (1982), 69 Ohio St.2d 136, 23 O.O.3d 178, 431 N.E.2d 987, one jury commissioner failed to keep a record of proceedings as required by R.C. 2313.12 and established his own system for independently determining competency of jurors. The failure to follow the statutory jury selection procedures did not automatically require reversal of the conviction. Accordingly, the failure in this instance to follow R.C. 2313.08, which was far less serious than the failure in *Puente,* does not require reversal.

**{¶ 73}** The appellant claims that the commissioners' failure to keep a record of the reasons some potential jurors were deemed unqualified prevented him from proving that the state violated the "fair cross-section" requirement of *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579. We disagree. Equal protection forbids intentional discrimination against any distinct group in choosing grand juries. See *Fulton*. However, not every grand jury has to represent a "fair cross-section," so long as the selection process is nondiscriminatory. *Id.; Castaneda v. Partida* (1977), 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498.

**{¶ 74}** To establish a prima facie case of discrimination, the appellant had to show that a recognizable, distinct group was substantially underrepresented in the jury pool by comparing its proportion in the population to the proportion called to serve as grand jurors over a significant period. *Fulton*, 57 Ohio St.3d at 122, 566 N.E.2d at 1198-1199, quoting *Castaneda v. Partida,* 430 U.S. at 494-495, 97 S.Ct. at 1280, 51 L.Ed.2d at 510-511. To make this statistical showing, the appellant did not need to know the ostensible reasons for exemptions and disqualifications. Accordingly, we reject Proposition of Law IX.

X

INDEPENDENT REVIEW AND PROPORTIONALITY ANALYSIS

{¶ 75} Having considered the appellant's propositions of law, we must independently weigh the aggravating circumstance against the factors presented in mitigation as required under R.C. 2929.05(A) and determine whether the sentence of death is appropriate.

*Aggravating Circumstance*

{¶ 76} The jury found appellant guilty of three aggravated murder counts as to each of his four victims. However, the trial court merged the twelve counts into four (one for each victim). Each count carried three death specifications: aggravated burglary, kidnapping, and multiple-murder. Before the penalty phase, the trial court merged the felony-murder specifications into the multiple-murder specifications and submitted only the multiple-murder specifications to the jury. Thus, the aggravating circumstance in this case was multiple murder.

*Mitigating Factors*

{¶ 77} Against this aggravating circumstance, we must balance several factors listed in R.C. 2929.04(B). We must consider the nature and circumstances of the offense and the appellant's history, character, and background. In addition, we must consider the mitigating factors listed in R.C. 2929.04(B)(1) through (7). The mitigating factors in R.C. 2929.04(B)(2), (4), (5), and (6) are not relevant to the case at bar.

{¶ 78} We find nothing mitigating in the nature of the offense. The appellant planned three of the murders well in advance. The appellant manipulated and used juveniles to help carry out his executions. The appellant kidnapped and restrained Madison in his own home. The appellant ordered Jessica to lure another victim to the crime scene, where he kidnapped him and another. The appellant physically and mentally tortured his victims. Finally, he went from room to room and shot each victim in the head, execution-style.

{¶ 79} Pursuant to R.C. 2929.04(B)(1), we must consider whether the victim of the offense induced or facilitated it. Three of the victims were involved in the drug trade. Narcotics is a dangerous trade. The three chose to participate in criminal activity. However, it cannot be said that the three victims "induced or facilitated" the offense. While participation in criminal activity certainly carries with it an element of serious risk, the unlawful taking of a human life cannot be deemed less serious simply because the victim was involved in unlawful activity. Our society's values do not permit such a ranking of the worth of human lives. Further, Wynn was apparently a bystander; there was no evidence connecting him to the narcotics trade. Therefore, we find no mitigation under this factor.

{¶ 80} Concerning R.C. 2929.04(B)(3), the appellant presented some evidence of mental disease or defect. Dr. Jeffrey L. Smalldon, a clinical psychologist with specialized training in neuropsychological assessment, testified on the appellant's behalf. Smalldon examined the appellant three times for a total of eleven hours, tested his intelligence, personality, and brain functioning. Smalldon also read the appellant's educational, medical, prison, and police records and interviewed his family.

{¶ 81} Smalldon diagnosed the appellant as having a personality disorder not fitting any of the specific categories established by the Diagnostic and Statistical Manual (DSM-III-R) used by psychologists and psychiatrists. Smalldon emphasized that while this disorder had antisocial features, he had not diagnosed the appellant with a full-blown antisocial personality disorder. Smalldon believed that the appellant's disorder was linked to his childhood due to the lack of a father figure and an overindulgent and protective mother. Further, Smalldon diagnosed the appellant with a low-grade depression that resulted from the criminal proceedings against him. Nonetheless, Smalldon found that the appellant did well in school and had above average intelligence.

**{¶ 82}** While Dr. Smalldon diagnosed the appellant as having a personality disorder, he also opined that this disorder did not affect his ability to make choices. Smalldon testified that "[p]eople with the same personality disorder * * * could engage in the *entire* gamut of choices available to human beings. There's *no connection* between that diagnosis and any particular behavior." (Tr. 3029; emphasis added.) Further, Smalldon opined that the appellant's mental disorder did not rise to the level of a mental disease or defect. Therefore, we find no mitigation under R.C. 2929.04(B)(3).

**{¶ 83}** Under R.C. 2929.04(B)(7), we must consider any other factors that are relevant to the issue of whether the appellant should be sentenced to death. In the penalty phase, the appellant made a brief unsworn statement. The appellant accepted responsibility for his chosen life of crime. However, he denied all guilt for the crimes in question. The appellant's mother testified about his childhood and lack of a father figure. His daughter testified that she loves him, will maintain contact with him, and does not want anything bad to happen to him. His trial counsel, Jerry Ingram, was present during the JJC incident. Ingram testified at the mitigation hearing after he had withdrawn as counsel for the appellant. Ingram testified about how the appellant ultimately released his hostages and surrendered at the JJC. Ingram also opined that the appellant would be at least seventy-five years old before becoming parole eligible and most likely would never be paroled.

**{¶ 84}** Dr. Smalldon also testified about the appellant's childhood. Smalldon believed that adults had given the appellant mixed messages about obeying the law when he was a child. His mother urged him to stay in school and avoid the street life, but she also brewed moonshine and bribed people not to report her. The appellant's grandfather was incarcerated for a period of time for murdering his common-law wife. The appellant's mother testified that two of her husbands abused her and the appellant knew it.

26

**{¶ 85}** Further, there was testimony that the appellant and his boyhood friends aspired to be like local gangsters who personified wealth and status. In this environment, the appellant began a life of crime at age eleven. This evidence is entitled to some mitigating weight under R.C. 2929.04(B)(7). Growing up fatherless in a neighborhood where gangsters were heroes, the appellant lacked the moral training that equips most people to obey the law. The set of "values" that permitted the appellant to execute competitors was most likely formulated in this early environment. However, this slight evidence of mitigation in the appellant's history, character, and background is insufficient to overcome the aggravating circumstance.

**{¶ 86}** Residual doubt was another factor the appellant argued. We find it insubstantial. Finally, the appellant argued that he did not kill the JJC hostages when he could have. However, the appellant had nothing to gain and much to lose by killing the hostages. When the appellant murdered Wynn, he demonstrated that he is capable of killing a bystander if it will advance his cause.

**{¶ 87}** We find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt in each case. Accordingly, we find that all four death sentences are appropriate.

*Proportionality of the Death Sentence*

**{¶ 88}** The death penalty is both appropriate and proportionate when we compare the appellant's case with similar capital cases. The appellant murdered four people. He experienced an unfortunate childhood with little to no moral guidance. However, such experiences do not mitigate the horrible crimes he committed.

**{¶ 89}** Since 1986, this court has reviewed eight death penalty cases where the R.C. 2929.04(A)(5) multiple-murder aggravating circumstance was the only one present. See *State v. Brooks* (1986), 25 Ohio St.3d 144, 25 OBR 190, 495 N.E.2d 407; *Bedford,* 39 Ohio St.3d 122, 529 N.E.2d 913; *State v. Sowell* (1988),

39 Ohio St.3d 322, 530 N.E.2d 1294; *State v. Lawrence* (1989), 44 Ohio St.3d 24, 541 N.E.2d 451; *State v. Coleman* (1989), 45 Ohio St.3d 298, 544 N.E.2d 622; *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894; *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071; and *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960.

{¶ 90} Out of the eight cases, this court has affirmed death penalties in seven. In many of those cases, the defendant was either under significant emotional stress or lacked substantial capacity to conform to the law due to mental disease or defect. See, *e.g.*, *Moreland; Awkal.* In this case, the appellant labored under neither impediment. In addition, like the appellant, the defendants in *Moreland* and *Awkal* could point to bad childhoods.

{¶ 91} *Lawrence* was the eighth case where the multiple-murder aggravating circumstance was the only aggravating circumstance present. In *Lawrence,* this court found that the mitigating factors outweighed a single multiple-murder aggravating circumstance and, therefore, vacated the death sentences. However, the mitigating factors in *Lawrence* included provocation, post-traumatic stress disorder rising to the level of a diminished-capacity mitigating factor under R.C. 2929.04(B)(3), a severe depression following the death of the defendant's infant son, lack of a significant criminal history, the defendant's voluntary military service, and his care for his family. In comparison, the mitigating factors in this case are nearly nonexistent. Moreover, this court affirmed the death penalty in *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227, a similar case involving the murder of two drug dealers. In *Hawkins,* there were two aggravating circumstances, but there also were only two victims, as compared to four victims here.

{¶ 92} Accordingly, we conclude that the death penalty in this case is neither excessive nor disproportionate when compared to the penalties approved in the above cases. Therefore, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

RESNICK, F.E. SWEENEY and COOK, JJ., concur.

DOUGLAS, J., concurs in judgment only.

MOYER, C.J., and PFEIFER, J., dissent.

_____

MOYER, C.J., dissenting.

{¶ 93} Upon review of the record and especially the transcript in this case, I conclude that the trial court failed to adequately protect appellant Williams's constitutional right to be tried before an impartial jury. Accordingly, I would reverse the trial court conviction and sentence, and grant the appellant a new trial. I therefore respectfully dissent.

{¶ 94} Williams argues that the trial court impermissibly failed to protect his right to an impartial jury from the twin evils of juror misconduct and juror bias in favor of the death penalty. I agree. I do so acknowledging that the transcript in this case reveals a crime as heinous and calculated as any that come before us. This case represents a test for the criminal justice system because, if the right to an impartial jury is not protected for the worst among us, it is guaranteed to none of us.

{¶ 95} The citizen jury is the bedrock upon which the edifice of American criminal justice is constructed. Thomas Jefferson, in a letter to Thomas Paine dated July 11, 1789, described the institution as "the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution." 15 Papers of Thomas Jefferson (1958) 269. Protection of the integrity of the jury system requires our constant vigilance. Though perfect impartiality is neither a requirement nor an attainable goal, it must nevertheless remain the abiding objective of the justice system, and all reasonable measures must be taken by trial courts to protect the constitutional right of a criminal defendant to a fair and impartial jury.

{¶ 96} In his first proposition of law, Williams alleges that his jury panel was tainted by juror misconduct. In the second proposition of law, he argues that the jury

was tainted because it included some jurors who had expressed their bias in favor of the death penalty. Either proposition, if accepted, is sufficient to support a reversal of the court of appeals; both have merit.

## I. Misconduct

{¶ 97} "The sixth amendment right to trial by jury is designed to ensure criminal defendants a fair trial by a 'panel of impartial, "indifferent" jurors.' * * * When possible juror misconduct is brought to the trial judge's attention [the judge] has a duty to investigate and to determine whether there may have been a violation of the sixth amendment." (Citations omitted.) *United States v. Shackelford* (C.A.6, 1985), 777 F.2d 1141, 1145. It is self-evident that if even one seated juror is biased or improperly influenced, the criminal defendant has not received the impartial jury guaranteed by the Sixth Amendment. *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492, 503; see *Parker v. Gladden* (1966), 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420. Finally, bias will be inferred if a juror is found to have deliberately concealed material information. *Zerka v. Green* (C.A.6, 1995), 49 F.3d 1181, 1186.

{¶ 98} It is undisputed that if appellant's case was decided by the full panel of impartial jurors to which he is constitutionally entitled, he cannot win a reversal based on the composition of the jury. My review of the record in this case causes me to conclude that the trial judge did not discharge his duty to guarantee, to a reasonable degree of certainty, that Williams received a fair trial by twelve impartial jurors. As a result, we cannot know whether his panel was impartial. Williams's conviction should therefore be reversed and the case remanded for a new trial.

{¶ 99} When investigating whether misconduct among seated jurors tainted the trial, it may frequently be necessary to question the behavior of unseated venirepersons in order to ascertain the effect of their acts on the seated jurors, or the nature of the interaction between the unseated and the seated jurors. This is particularly true when the issue is exchange of information among prospective jurors.

Such consideration may require the trial judge to engage in further questioning of venirepersons beyond simply asking prospective jurors whether they are concealing information. Where there are substantial grounds to believe that a prospective juror is concealing information that bears upon a juror's impartiality, it is an abuse of discretion for the trial court to do no more than ask a prospective juror whether he or she can render a fair verdict. See *United States v. Shackelford*, 777 F.2d at 1145.

{¶ 100} The voir dire transcript in this case suggests that there was some discussion—perhaps considerable discussion—among venirepersons regarding the facts of the case. According to the testimony, the alleged topics of discussion included the defendant, his family, organized crime, murder, extortion, money laundering, prostitution, drugs, security, and fear of reprisal. Conversations reportedly took place near the courthouse building, in the hallways, in the jury room, and in the courtroom itself. The reported statements, and related denials of outside knowledge, constitute substantial evidence of possible concealment by prospective jurors. Thus, I would hold that the trial court committed reversible error in refusing either to dismiss the challenged jurors or to investigate further.

{¶ 101} During individual voir dire, prospective juror Janet Parsons identified juror Joann Eddleman as a person who repeated to Parsons, and to an uncertain number of other prospective jurors, information and rumors regarding Williams. Parsons reported that Eddleman claimed to have been told the case was from Youngstown, that it involved drugs, and that Williams had eluded authorities for some time. Parsons also told the trial court she believed Eddleman had obtained her information through someone outside the venire who was a Youngstown resident. Parsons also reported that there was another woman within earshot of the conversation between herself and Eddleman who may have heard what was said. This third prospective juror was never identified. Over objection, the trial court declined to inquire further, or to permit appellant's counsel to do so. Accordingly, there is no way to know who, if anyone, overheard the conversation.

**{¶ 102}** When Eddleman was questioned by the trial court as to whether she knew anything else about the case, she responded, "Just what I've heard through you." Because Eddleman appeared for individual voir dire ahead of Parsons, Eddleman was not questioned further on her denial. The trial court did not, however, heed defense counsel's warning that it was necessary later to requestion Eddleman more extensively to determine whether she was concealing misconduct from the court. Instead, the court responded sarcastically and ignored the request.

**{¶ 103}** I cannot agree with the reasoning of the majority when it attempts to justify Eddleman's response by observing that her answer was in fact truthful because she did not *know for certain* that the information she had been given was accurate. I am not convinced, as the majority apparently is, that this strained and unlikely interpretation of Eddleman's response eliminates legitimate concerns of concealment and absolves the trial court of the obligation to investigate further in defense of Williams's constitutional rights.

**{¶ 104}** The questions raised about Eddleman should have been sufficient to arouse trial court concern in themselves. They are not, however, the sole indications that extensive discussion of potentially prejudicial information and rumors took place in the jury room, possibly tainting other seated jurors and raising issues of further possible concealment. Further indications include statements by, attributed to, or about the following prospective jurors: Aristide, Blackwell, Colledge, Forsyth, Gombaski, Hlivko, Lawrence, Rohwedder, Stout, and Tanski. The subjects of the alleged comments include:

**{¶ 105}** Concerns about what appeared to be heightened security in the courthouse for this case and fears that security might not be adequate; possible necessity of wearing wigs, glasses, or other disguises to avoid retribution from the defendant or his family; the rumored allegation that Williams had tried to kill one of the witnesses; the possible involvement of the defendant in organized crime,

prostitution, money laundering, and extortion; and the rumor that the defendant was able to evade police for two years, hence the delay in bringing the case to trial.

{¶ 106} In particular, prospective juror John Gombaski raised concerns about prejudicial communications and possible concealment among members of the venire. Indeed, Gombaski was excused for cause when he admitted that what he heard had caused him to presume Williams was guilty. Gombaski reported overhearing court employees talking about the case and admitted that he told two other venirepersons what he remembered of the conversation. This included Gombaski's perception that the case was from Youngstown, that it involved a murder, and that it was related to organized crime (no evidence was offered of any connection between Williams and organized crime). Though the majority chose not to discuss the issues presented by Gombaski's statements, I believe his testimony raises serious questions that the trial court should have investigated as required by the Ohio and United States Constitutions.

{¶ 107} The trial judge here, however, stifled rather than pursued further investigation. Indeed, he instructed Gombaski not to repeat anywhere what he had heard—including in the context of individual voir dire—and told Gombaski that he did not even want to know the content of the statements.

{¶ 108} Later, when defense counsel returned to the issue, Gombaski said he thought the name "Forsyth" sounded familiar as that of one of the people who had heard his statements about murder, extortion, and organized crime. Forsyth, a prospective juror who was seated, however, had told the court she heard nothing from other prospective jurors concerning charges against Williams.

{¶ 109} If Gombaski is correct that he talked to Forsyth, then she lied when she said she had heard nothing. If she lied, bias is inferred and a mistrial is appropriate. *Zerka v. Green*, 49 F.3d at 1186. If, on the other hand, Forsyth is being truthful, it was two other prospective jurors who apparently heard Gombaski's report. It is possible that there was no concealment among seated jurors in this case.

Unfortunately, it is impossible to conclude with any certainty whether and to what extent prospective jurors engaged in discussions or heard discussions about the case because the trial judge made no attempt to verify that there were none. Rather, he stifled further inquiry with comments such as, "we're not going to make a career out of this one."

{¶ 110} The transcript contains the following conversation reflecting defense counsel's concern over possible concealment and the apparent indifference of the trial court:

"The Court: John, go ahead.

"[Defense Counsel]: Judge, we've gone over this at lunch, it's something that reared it's [*sic*] head yesterday. [Counsel then gave a factual recitation of the various comments of the jurors.] * * *

"I would submit, Your Honor, that we need to do several things, that is, call back the jurors that I have indicated and ask them more specific questions about whether there were conversations and, if so, what those conversations were. Of course, that would then lead to some inquiry as to whether or not those conversation [*sic*] have left an impression upon them as, if you recall, Mr. Gombaski indicated the previous information had left an impression on him. I also think we may need to talk to [the jury commissioners' office] to find out about the seating arrangements, who the ladies—

"The Court: Why don't we hire a detective to go up and to [*sic, do]* this for us. Any statements from the prosecutor?"

{¶ 111} Minutes later the following colloquy transpired:

"[Defense Counsel]: Well, I can tell you from the research that we have done recently * * * when these issues unfortunately arise * * * it triggers an affirmative duty not only on the part of counsel—

"The Court: And the Court will do what it can about it to stop it. That's all I can do.

"[Defense Counsel]:  Well, we also have to inquire into the past, not only as to the future.

"The Court:  True.  We may do that on general voir dire, we might do it individually.  But right now we're going to finish what we are doing."

{¶ 112} No further inquiry was undertaken.

{¶ 113} Defense counsel objected to the trial court's apparent indifference, and offered reasonable suggestions to remedy the perceived threats to their client's constitutional right to an impartial jury.  As appellant observes, it would not be necessary to "hire a detective" if the trial court had performed its duty by engaging in individual questioning of all the prospective jurors.  The constitutional requirement does not extend to the trial judge the discretion to decline to take protective measures to assure the defendant and the state that the jury will be impartial.  On the facts in this record, the trial judge clearly erred when he failed to examine prospective jurors to assure defendant and the state that an impartial jury was impaneled.

## II.  Bias

{¶ 114} I would also reverse this conviction on the ground that Williams was not adequately protected from juror bias in favor of the death penalty.  Of the nine prospective jurors for whom the trial court denied defense challenges for cause based on expression of death penalty bias, five were excused upon the exercise of peremptory challenges by defense counsel, another was excused for personal reasons, the number of one of the jurors was not reached, and two, Eddleman and Camp, were seated as jurors.  Appellant argues that each of these prospective jurors was biased in favor of the death penalty.  With regard to Eddleman, Scanlon, and Subecz, I agree.

{¶ 115} In *Morgan v. Illinois*, the United States Supreme Court emphasized the importance of voir dire to the right of the defendant to a fair trial.  "Were *voir dire* not available to lay bare the foundation of petitioner's challenge for cause

against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so." (Emphasis *sic*.) *Id*. at 733-734, 112 S.Ct. at 2232, 119 L.Ed.2d at 506.

{¶ 116} In *Wainright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851-852, the United States Supreme Court held that a prospective juror should be excused for cause if his views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " A prospective juror who will automatically vote for the death penalty must be excused for cause. *Morgan v. Illinois*, 504 U.S. at 729, 112 S.Ct. at 2229, 119 L.Ed.2d at 502; see *Ross v. Oklahoma* (1988), 487 U.S. 81, 84-85, 108 S.Ct. 2273, 2276-2277, 101 L.Ed.2d 80, 87-88.

{¶ 117} Juror Eddleman again presents the greatest difficulties. The majority admits that Eddleman contradicted herself on voir dire. Despite her repeated statements that she would prefer death and would not consider alternative life sentences, the majority concludes that the court's rehabilitation of Eddleman was successful because "the trial judge's questions were more than general inquiries regarding a juror's ability to be fair and impartial." I disagree. I believe this case represents precisely the sort of rehabilitation the United States Supreme Court intended to prohibit in *Morgan v. Illinois* when it held that general questions to a prospective juror by the court relating to fairness or impartiality cannot negate a statement by the prospective juror that he or she would automatically vote for death. 504 U.S. at 735-736, 112 S.Ct. at 2233, 119 L.Ed.2d at 506-507.

{¶ 118} Eddleman made many specific statements during the course of voir dire to the effect that she would not be impartial in the penalty phase. Among them she stated, "If he was convicted of the murders I would say no, I would not consider that with parole." She explained further, "Because if the murders were committed I

don't—I don't believe that they should ever be released." Again, she remarked, "I wouldn't—I do not believe there should even be parole considered if somebody would have committed the murder. That's what I mean." Yet again, explaining her position very specifically, she said, "So I would—well, what I'm saying, I would not believe in the parole so therefore I would not be able to, if it was not the death sentence, I would not feel comfortable with the 20 year and parole or the 30 year and parole."

{¶ 119} Next, Eddleman unambiguously affirmed that her preference for the death penalty would be automatic. Though consistent with her previous responses, such statements must arouse profound doubt as to whether impartiality would ever be possible for Eddleman. The exchange was the following:

"[Defense Counsel]: You understand that you only have those three options if you get to the point—

"Juror Eddleman: Those three options, if it came right down to it, it would probably be the death penalty then. If there was any remote chance of them being paroled, I would probably go with the death penalty.

"[Defense Counsel]: Automatically, just because of the possibility of parole?

"Juror Eddleman: Yes.

"[Defense Counsel]: And are you saying that even though you know that these three alternatives should start out even in your mind? You are being honest with me.

"Juror Eddleman: Yes.

"[Defense Counsel]: And because of what you are saying about the death penalty being automatic, because of the eligibility of parole, you would be unable to fairly consider life imprisonment, am I right?

"Juror Eddleman: If it was without ever a chance of parole, yes.

"[Defense Counsel]: That's not the way it is.

"Juror Eddleman: Since we don't have a choice[,] I would say the death penalty.

"[Defense Counsel]: And you say that knowing that there are these life sentencing options that you should consider?

"Juror Eddleman: Because whenever I think about it I would think well, maybe 30 years down the line somebody may be getting out of prison and might meet up with one of my children or something. That's what I'm thinking of whenever I think of it.

"* * *

"[Defense Counsel]: Is your bottom line, if I have to determine the sentence I'll vote death because there's eligibility for parole?

"Juror Eddleman: Yes."

{¶ 120} In contrast, Eddleman made very few responses suggesting that she could set aside her bias. Following the preceding exchange, the judge elicited a general response:

"The Court: Mrs. Eddleman, do you agree that you can listen to and follow the instructions of the Court?

"Juror Eddleman: Yes."

{¶ 121} Then, after explaining the two phases of the trial and the sentencing options, the court asked, "Can you follow the instructions of law?" Eddleman answered, "Yes."

{¶ 122} The only responses Eddleman gave to the prosecutor indicating that she could consider the sentencing options equally were given in general terms:

"[Prosecutor]: Okay. And you would follow the court's instructions?

"Juror Eddleman: Yes.

"[Prosecutor]: On the law?

"Juror Eddleman: Yes.

"[Prosecutor]:  You understand the death penalty is not an automatic punishment?

"Juror Eddleman:  Yes, I do.

"[Prosecutor]:  If you determine guilt in the first phase you still have to hear all the evidence in the second phase.

"Juror Eddleman:  Yes.

"[Prosecutor]:Thank you very much."

**{¶ 123}** The majority concludes that though it is "difficult from reading the transcript to determine whether Eddleman was overstating her beliefs concerning the death penalty to defense counsel, or understating them to the judge and prosecutor," we must defer to the determination of the trial judge, who directly observed Eddleman's responses, that she could be fair and impartial.

**{¶ 124}** In contrast, I would hold that, despite the acknowledged advantage of the trial court in observing the demeanor of the juror, on the transcript before us, it is not only difficult but impossible to determine whether Eddleman was overstating her beliefs to defense counsel or understating them to the judge and prosecutor.  The majority holds that we must assume the trial court was able to make the correct ruling based on observation of Eddleman's demeanor.  I believe that in a capital case, when a large preponderance of specific answers suggest firmly established bias, the Ohio and federal Constitutions require the trial judge to exercise his or her discretion to protect the right of the accused to an impartial jury.

**{¶ 125}** According the United States Supreme Court, "*Witherspoon* and its succeeding cases would be in large measure superfluous were this Court convinced that such general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.  But such jurors—whether they be unalterably in favor of, or opposed to, the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding." *Morgan*

*v. Illinois*, 504 U.S. at 734-735, 112 S.Ct. at 2232-2233, 119 L.Ed.2d at 506. If this reasoning applies to require trial courts to afford defense counsel the opportunity to question prospective jurors on pro-death-penalty bias, it must apply with equal force to cases in which the trial judge permitted only inadequate questioning and refused to remove jurors whose answers to specific questions revealed bias.

{¶ 126} The argument of the majority that voir dire is an adversarial process is not without persuasive force. Both sides do indeed attempt to nudge the prospective juror in the desired direction, and it is the job of the impartial judge to sort the wheat from the chaff. A degree of deference to the trial court is clearly appropriate. As in all cases of trial court discretion, however, there are boundaries which it is our duty to identify. I would hold that in the case before us the trial court has abused its discretion.

{¶ 127} Moreover, it is noteworthy that during voir dire in this case, the adversarial nature of the proceeding expressed itself more in the relationship between defense counsel and the judge than in the relationship between defense counsel and prosecutor. The prosecutor engaged in very little rehabilitation, while the trial judge played the primary role. The transcript reveals that, generally, the prosecutor would question the prospective juror briefly after the introductory remarks of the judge, eliciting responses tending to show that the juror believed he or she could vote for the death penalty if need be, and that the juror believed that he or she could follow the law and be fair. Defense counsel would then probe directly into issues of bias, misconduct, or prejudgment of the defendant. Finally, the trial judge would then engage in a brief and general rehabilitation of the juror. In the case of juror Eddleman, the prosecutor did not ask her any questions at all following the specific statements of bias elicited by defense counsel.

{¶ 128} Contrary to the image created by the majority opinion of attorney adversaries nudging the juror toward expressions that would serve their client's interests, the prosecutor made no attempt to elicit specific responses from the juror

which might tend to negate statements suggesting bias against the defendant or predisposition in favor of the death penalty. We should be troubled by the blurring of roles under circumstances where the trial judge may appear to have assumed the posture of the prosecutor, rather than that of the neutral arbiter, in what is quite naturally, as the majority observes, an adversarial proceeding.

{¶ 129} The Ohio and federal Constitutions do not allow us to prefer deference to the discretion of the trial judge over the right of the accused to a fair and impartial jury. When the statements of the juror are ambiguous, we must rely on the observations of the trial judge and defer to his or her evaluation of the truthfulness of the juror. Where statements suggesting bias predominate in quantity, specificity, and certainty, countered by a relatively few general statements that the juror believes he or she can follow the law and be fair, deference to the trial court defies the constitutional requirements.

{¶ 130} Beyond the example of juror Eddleman, I note without elaboration that of the remaining jurors removed by peremptory challenge, both prospective jurors Scanlon and Subecz gave answers clearly indicating bias unremedied by their general statements that they could follow the instructions of the court and be fair. They, too, should have been dismissed for cause.

{¶ 131} In 1769, the great English scholar William Blackstone wrote, "[T]he liberties of England cannot but subsist, so long as this *palladium* [the right of trial by jury] remains sacred and inviolate; not only from all open attacks, * * * but also from all secret machinations, which may sap and undermine it." 4 Blackstone's Commentaries (1769) 350. Vigilance is required to protect the integrity of the jury from infirmities that may sap and undermine it. Such infirmity is present in the composition of the jury that sentenced Williams to death. I would therefore vacate the conviction and sentence and grant Williams a new trial.

PFEIFER, J., concurs in the foregoing dissenting opinion.

_____