[Cite as *State v. Baker*, 2025-Ohio-5463.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

STATE OF OHIO,

  PLAINTIFF-APPELLEE,     **CASE NO. 11-25-02**

v.

NEWLYN W. BAKER,       **OPINION AND**
              **JUDGMENT ENTRY**
  DEFENDANT-APPELLANT.

---

Appeal from Paulding County Common Pleas Court
Trial Court No. CR-21-603

Judgment Affirmed

Date of Decision: December 8, 2025

---

APPEARANCES:

 *Matthew Bangerter* **for Appellant**

 *Joseph R. Burkard* **for Appellee**

**WALDICK, P.J.**

{¶1} Defendant-appellant, Newlyn Baker ("Baker"), appeals the judgment of conviction and sentence entered against him in the Paulding County Court of Common Pleas, following a jury trial in which Baker was found guilty of Possession of Marihuana, a felony of the second degree.[1]  For the reasons set forth below, we affirm.

*Procedural History*

{¶2} This case originated on December 16, 2021, when a Paulding County grand jury returned a two-count indictment against Baker. Count 1 of the indictment charged Illegal Cultivation of Marihuana, in the vicinity of a juvenile and in an amount equal to or exceeding 20,000 grams, a first-degree felony in violation of R.C. 2925.04(A) and (C)(5)(f). Count 2 of the indictment charged Possession of Marihuana, in an amount equal to or exceeding 20,000 grams, a second-degree felony in violation of R.C. 2925.11(A) and (C)(3)(f).

{¶3} On December 27, 2021, an arraignment was held and Baker entered pleas of not guilty to the charges in the indictment.

{¶4} On April 1, 2022, Baker filed a motion in limine, requesting that the trial court not permit evidence of the weight of the alleged marijuana to be

---

[1] The Ohio Revised Code uses the spelling "marihuana" for the drug at issue in this case.  This opinion will utilize that spelling for the drug in references relating to, or stemming from, the Ohio Revised Code; otherwise, this opinion shall use the updated and commonly accepted spelling, "marijuana."

introduced by the prosecution at trial. In that motion, Baker asserted that the stalks of the marijuana plants at issue in the case had been weighed in addition to the buds, leaves, and stems, which Baker argued resulted in an inaccurate weight in violation of law. Baker also argued in that motion that portions of the plants may constitute hemp, and not marijuana, based on the definitions of "marihuana" and "hemp" contained in the Ohio Revised Code. Baker requested that his counsel be provided a representative sample of the plants in evidence, so that independent analysis could be done by the defense on various parts of the plants.

{¶5} On May 17, 2022, a hearing was held on the issues raised in Baker's motion in limine. On May 25, 2022, the trial court filed a judgment entry granting Baker's request for a representative sample of the plants.

{¶6} On June 3, 2022, Baker filed several additional motions, seeking to re-inspect the evidence, to disallow the state's lab report as evidence at trial, and to re-weigh the evidence.

{¶7} On September 28, 2022, the trial court granted Baker's motions to re-inspect and re-weigh the evidence.

{¶8} On November 8, 2023, after evidentiary hearings were held on the various pending motions, the trial court filed a judgment entry granting Baker's motion for independent testing but overruling the rest of the motions.

{¶9} On March 18, 2024, the State of Ohio filed a motion in limine seeking to exclude trial testimony and other evidence relating to Baker's position that the marijuana was improperly weighed. The motion specifically sought to exclude at trial the testimony of an expert witness retained by the defense, Frank Telewski.

{¶10} On April 16, 2024, the trial court filed a judgment entry granting the state's motion in limine.

{¶11} On October 2, 2024, the State of Ohio moved to amend Count 1 from a first-degree felony to a second-degree felony by striking the allegation in the indictment that the marijuana cultivation had occurred in the vicinity of a juvenile. The trial court granted that motion on that same date.

{¶12} On November 18, 2024, a jury trial commenced in the case. During the course of the three-day trial, the prosecution presented the testimony of nine witnesses and 37 evidentiary exhibits.

{¶13} At the close of the state's case, Baker moved for acquittal pursuant to Crim.R. 29, which was overruled by the trial court. Baker then presented the testimony of one witness.

{¶14} Following closing arguments of counsel and instructions of law by the trial court, the jury received the case for deliberation on November 20, 2024, at 3:35 p.m. After the jury was excused from the courtroom to begin deliberating, the Crim.R. 29 motion was renewed by Baker and again overruled. Later that same

date, the jury returned verdicts on both counts, finding Baker not guilty on Count 1 but guilty on Count 2. The trial court accepted the verdicts, discharged the jury, and ordered a presentence investigation.

{¶15} On November 22, 2024, Baker filed a multi-part post-trial motion in which he raised a claim of juror misconduct. Baker alleged that Juror #1, who had been the jury foreman, was a reserve officer with the Paulding County Sheriff's Office, that the juror had failed to disclose that affiliation during voir dire, and that the juror's non-disclosure and the fact that the juror was not excused from serving resulted in prejudice to Baker. In that motion, Baker sought an extension of time to file motions pursuant to Criminal Rules 29 and 33, and requested that the sentencing hearing be postponed.

{¶16} On December 3, 2024, the prosecution filed a response to Baker's motion relating to Juror #1. In that response, the State of Ohio asserted that Juror #1 had never been a deputy sheriff or reserve officer with the Paulding County Sheriff's Office, and attached the affidavit of Paulding County Sheriff Jason Landers to support that assertion. As reflected by that affidavit, Juror #1 had never been commissioned by the Paulding County Sheriff's Office as a deputy or a reserve deputy, but had been employed at the Paulding County Jail as a civilian part-time corrections officer from May 6, 2013 through August 25, 2015, and as a civilian full-time corrections officer from September 11, 2006 through December 14,

2007. The prosecution also noted in its response that if the defense had a concern about a juror's employment history or affiliation with law enforcement, then such questions could have been asked by defense counsel during voir dire.

{¶17} On December 6, 2024, Baker filed a reply to the state's response, and a memorandum in support of that reply, in which the claims of juror misconduct as to Juror #1 were reiterated, and in which Baker asserted that a new trial should be granted or, alternatively, a judgment of acquittal should be entered. On that same date, Baker filed a motion for a new trial pursuant to Crim.R. 33. That motion contained numerous claims as to why a new trial should be granted, including but not limited to the claim of juror misconduct on the part of Juror #1. On December 6, 2024, Baker also filed a motion seeking a post-verdict judgment of acquittal pursuant to Crim.R. 29 in which, among other claims, Baker asserted that a judgment of acquittal should be granted on the basis of juror misconduct relating to Juror #1.

{¶18} On January 2, 2025, the trial court filed a judgment entry overruling Baker's motion for a new trial and motion for a post-verdict judgment of acquittal.

{¶19} On January 15, 2025, a sentencing hearing was held. The trial court sentenced Baker to a mandatory prison term of six years.

{¶20} On January 17, 2025, the trial court journalized its sentencing orders.

{¶21} On January 23, 2025, Baker filed the instant appeal.

*Summary of Evidence Presented at Trial*

**{¶22}** During the State of Ohio's case-in-chief at trial, evidence was presented that on August 24, 2021, Investigator Robert Garcia, a deputy with the Paulding County Sheriff's Office assigned to the Multi-Area Narcotics Task Force (the "MAN Unit"), received an anonymous tip that marijuana was being grown on the property at 12504 Road 72 in Haviland, Ohio, which is located in Paulding County. After receiving that information, Garcia proceeded to review photographs of the property that were posted on the website of the Paulding County Auditor. The photographs depicted a residence on that property, which was the home of Newlyn Baker, and the pictures reflected that there was an enclosure of some sort on the property, to the rear of the residence.

**{¶23}** On August 25, 2021, Garcia contacted Special Agent Ed Biederstedt of the Ohio Bureau of Criminal Investigation ("BCI"). At the time, Biederstedt was the coordinator of the marijuana eradication program run by BCI and the Ohio Attorney General's Office. Garcia requested that Biederstedt arrange a helicopter flyover of the property at 12504 Road 72, and Biederstedt agreed to set that up, as BCI already had a helicopter in the air working on marijuana eradication in northwestern Ohio.

**{¶24}** Later in the day on August 25, 2021, Biederstedt advised Garcia that the helicopter was on its way to Paulding County. As Garcia waited on the ground

in the general area of 12504 Road 72, a BCI helicopter flew over Baker's property, with BCI agent David Horn onboard the helicopter serving as a spotter. From his position in the helicopter flying overhead Baker's property, Horn could see marijuana plants on the property, and he took several photographs of what he observed. The photographs were then electronically forwarded to Biederstedt and Garcia, and the pictures showed at least ten marijuana plants growing inside an open-air enclosure behind Baker's house. After receiving the information from Horn that marijuana was growing on the property, Garcia drafted an affidavit and obtained a search warrant for the premises at 12504 Road 72.

{¶25} On August 27, 2021, the MAN Unit executed the search warrant at Baker's property on Road 72. Baker had acquired ownership of the real property at that address on February 8, 2021 and, at the time the search warrant was served, the house at that address was Baker's primary residence. At the time officers entered the home pursuant to the search warrant, Baker's mother, Sharon Baker, was the only person present at the residence. During a search of the property, officers located 11 extremely large marijuana plants towards the rear of the property. Ten of the marijuana plants were located within an open-air wood and metal enclosure, and one plant was just outside the enclosure. The ten large plants inside the enclosed area were growing in pots, and were held up by cages of wire fencing. In the enclosure, investigators also located gardening tools and fertilizer containers. In the

front passenger seat of a pickup truck parked near the enclosure, investigators located a bag of fertilizer. There were also water tanks in the vicinity of the enclosure. On the property near the enclosure there was also an enclosed utility trailer, in which investigators located grow lights and other materials used for growing plants.

{¶26} While serving the search warrant at Baker's property, task force investigators also observed that there was an electrical receptacle in the electrical meter box on the side of Baker's residence. There was an extension cord that ran from the receptacle towards and into the enclosure at the rear of the property.

{¶27} Pursuant to the search warrant, task force investigators seized the marijuana plants, by chopping each plant off at its base, above the dirt in which the plants were growing. To do so, investigators used a reciprocating power saw to cut through the main stalk of each plant, as the stalk of each plant was approximately the diameter of an adult male's wrist. The roots of the plants were left behind in the large pots in which the plants had been growing. After being cut down, the plants were transported to the Paulding County Sheriff's Office, where they were hung inside a secure evidence storage unit so that the plants could dry prior to being submitted to BCI for weighing and testing.

{¶28} On September 9, 2021, Deputy Garcia and several other investigators were granted access to the secured evidence storage unit by Lieutenant Matthew

McDougal. The investigators then chopped all the plant material off the main stalks of the plants that had been seized, and bagged that material into nine large plastic garbage-style bags. The main stalks of the plants, from which the rest of the plant material had been removed, were placed into a tenth plastic garbage bag. After the plant material was bagged up in that manner, Garcia transferred the bags of evidence to the evidence vault at the MAN Unit's office in Defiance, turning the care and custody of the bags over to Putnam County Sheriff's Deputy Todd Pingle, the task force evidence technician. The plant material was subsequently transported to the BCI lab in Bowling Green, Ohio by Deputy Pingle.

{¶29} On October 28, 2021, Samuel Fortener, an expert in forensic science employed by BCI in the agency's chemistry unit, weighed and then chemically analyzed the plant material at issue. As to the weight of the plant material, Fortener testified that the marijuana plants in the nine bags submitted to BCI had a combined weight of 20,166.8 grams, plus or minus 2.1 grams. That combined total weight was exclusive of any packaging material, and did not include the tenth bag of large stalks that had been separated from the other plant material by investigators before submission to BCI.

{¶30} As to the analysis he performed on the submitted evidence, Fortener testified that he first opened the nine bags, which were State's Exhibits 28 through 36 at trial, and visually inspected the contents, which was vegetative material.

Fortener then took a composite sample of the material in those bags, meaning he removed a portion of the vegetative material from each of the nine bags, which he combined into one gross sample upon which to perform his analysis. In collecting the composite sample from each of the nine bags, Fortener included both leafy material and stems. Fortener then used a chemical color test, called a Modified Duquenois-Levine test, to confirm the presumptive presence of cannabinoids in the composite sample. Next, Fortener performed a moisture content analysis on the composite sample because, based on statutory requirements, BCI is required to report the tetrahydrocannabinol, of "THC", content of marijuana on a dry-weight basis. Finally, Fortener performed a quantitative analysis of the composite sample, a process in which a portion of the sample is extracted into a solvent and then chemically analyzed by using a liquid chromatograph machine designed for such a purpose. As a result of that analysis, Fortener determined that the composite sample contained marijuana, meaning cannabis with a THC content of 2.57 percent, plus or minus .95 percent, calculated on a dry-weight basis. After being questioned during cross-examination about the statutory definitions in Ohio of marijuana and hemp, Fortener testified on redirect-examination that, based on his analysis, the material in the nine bags was marijuana, and not hemp.

{¶31} After the prosecution rested its case at trial, the defense presented the testimony of one witness, John Moore, Jr. Moore testified that he lives in Paulding

and, in the spring of 2021, he met a female named Jamie Gandy at a local bar. For a short time, the two of them were involved in a casual dating relationship. During that time, Moore drove to Coldwater, Michigan and purchased around $2500.00 worth of gardening supplies for Gandy, using cash and a credit card that Gandy had given him. Upon returning to the Paulding area with the gardening supplies, Moore met up with Gandy at a property located off of Road 72, which Moore later learned was owned by Baker. Moore helped Gandy unload the gardening supplies. Moore testified that Gandy told him she was planting banana plants. However, Moore did not assist Gandy in planting any plants, nor did he see Gandy plant any plants. Gandy subsequently passed away, prior to the trial being held in this case.

*Assignments of Error Raised on Appeal*

**First Assignment of Error**

> **The defendant-appellant was denied due process and effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 5 and 10 of the Ohio Constitution.**

**Second Assignment of Error**

> **The trial court erred by failing to ensure that the jury was permitted to review admitted evidence during deliberations, in violation of defendant-appellant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 5 and 10 of the Ohio Constitution.**

**Third Assignment of Error**

**The trial court erred to the prejudice of the defendant-appellant in denying his motion for acquittal made pursuant to Crim.R. 29(A).**

**Fourth Assignment of Error**

**The trial court erred by failing to grant a new trial after it was revealed that a juror failed to disclose during voir dire that he was a corrections officer, in violation of appellant's Sixth and Fourteenth Amendment rights to an impartial jury and due process of law.**

**Fifth Assignment of Error**

**The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.**

*Analysis of Assignments of Error*

*First Assignment of Error*

{¶32} In the first assignment of error, while the assignment of error as phrased by Baker asserts a claim of ineffective assistance of counsel, Baker actually makes three arguments relating to his assertion, first raised in the pre-trial proceedings, that the marijuana plants in this case were not properly weighed by the BCI expert, Samuel Fortener, who testified to the chemical analysis and weight of the marijuana on behalf of the State of Ohio at trial.

{¶33} The record reflects that Baker sought to introduce evidence and argument at trial challenging the weight of the marijuana, based on Baker's theory that the plant material seized from his property may have contained, in part,

materials that did not constitute marijuana as that drug is defined by Ohio law. Specifically, Baker's theory was, and is, that some portion of the overall quantity of plant material seized from him may have contained a THC level low enough to constitute hemp, and therefore was not marijuana, based on the fact that hemp is excluded from the legal definition of marijuana in Ohio. Baker's position is, that for purposes of determining the weight of the marijuana at issue, the State of Ohio was required to separate out any statutorily excluded, "non-marijuana" parts of the plants from the plant material that Baker was charged with, and found guilty of, possessing.

**{¶34}** To potentially advance that theory at trial, Baker gave notice during the pre-trial stage of the proceedings of his intent to call an expert witness, biologist Frank Telewski, to testify at trial regarding the testing and weighing of the marijuana. In response, the State of Ohio filed a motion in limine seeking to bar the defense from presenting Telewski's testimony and from otherwise presenting evidence in support of the hemp theory at trial with regard to the weight of the marijuana.

**{¶35}** On April 16, 2024, the trial court filed a judgment entry granting the prosecution's motion in limine, finding that Telewski's testimony would be irrelevant and that any probative value of his report and testimony was substantially outweighed by the danger of confusion of the issues or of misleading the jury.

{¶36} On appeal, Baker argues in the first assignment of error that the trial court erred in excluding at trial Telewski's testimony and Baker's arguments in furtherance of his theory that not all of the plant material weighed by BCI was marijuana and, therefore, the marijuana in this case may not have weighed at least 20,000 grams, the threshold weight required for Baker to have been convicted of the second-degree felony crime of possessing marijuana as charged in Count 2 of the indictment.

{¶37} Baker's claims here focus on the statutory definition of marijuana and the exclusions to that definition, specifically the statutory definition of hemp.

{¶38} R.C. 2925.01(AA) provides that, as used in Chapter 2925 of the Ohio Revised Code, "marihuana" has the same definition as found in R.C. 3719.01.

R.C. 3719.01(M) defines "marihuana" as:

[A]ll parts of a plant of the genus cannabis, whether growing or not; the seeds of a plant of that type; the resin extracted from a part of a plant of that type; and every compound, manufacture, salt, derivative, mixture, or preparation of a plant of that type or of its seeds or resin. "Marihuana" does not include the mature stalks of the plant, fiber produced from the stalks, oils or cake made from the seeds of the plant, or any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks, except the resin extracted from the mature stalks, fiber, oil or cake, or the sterilized seed of the plant that is incapable of germination. "Marihuana" does not include "hemp" or a "hemp product" as those terms are defined in section 928.01 of the Revised Code.

R.C. 928.01(C) defines "hemp" as:

[T]he plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths per cent on a dry weight basis.

{¶39} In the instant case, as previously indicated, Baker's theory relating to the weight of the marijuana at issue is that parts of the marijuana plants, particularly the non-leaf portions, may have contained a low enough percentage of tetrahydrocannabinol, or THC, that qualified those parts of the plants as hemp, which is excluded from the statutory definition of marijuana. Baker argues that the trial court erred in excluding evidence that Baker sought to present at trial to advance that theory, including but not limited to testimony from the expert witness that he proffered prior to trial. Baker's attempts to present such evidence at trial were found by the trial court to be inadmissible pursuant to the decision of the Supreme Court of Ohio in *State v. Wolpe*, 11 Ohio St.3d 50 (1984).

{¶40} In *State v. Wolpe*, the defendant-appellant was found guilty of marijuana trafficking in a weight over the bulk amount. *Wolpe*, at 50. In that case, the weight of the marijuana seized from Wolpe was 390.2 grams, in excess of the bulk amount of 200 grams as then set forth in 2925.01(E)(3). *Id*. In light of legal precedent that existed at that time in Ohio's lower appellate courts, Wolpe advanced the theory that, based on the statutory definition of marijuana, the prosecution was required to separate all statutorily excluded plant-material from any quantity of

marijuana prior to its being weighed to determine its weight in a criminal case. *Wolpe*, at 51. On the other hand, the prosecution proposed a construction of the statute defining marijuana that would permit a mixture of excluded and non-excluded parts of the marijuana plant to be weighed in order to determine the weight of the marijuana for purposes of a criminal prosecution. *Id*.

{¶41} As set forth by the Supreme Court of Ohio in *Wolpe*, the specific issue presented in that case was, for purposes of weight, "whether the state has the burden of separating from a quantity of a substance alleged to be marihuana the material statutorily excluded from the definition of 'marihuana.'" *Wolpe*, at 50.

{¶42} Upon reviewing the arguments presented, and the statutory definition at issue, the Supreme Court of Ohio agreed with and adopted the state's construction of the statute. *Id*., at 51-52. In so doing, the Ohio Supreme Court construed a previous version of the statutory definition of marijuana, which at that time was codified in R.C. 3719.01(Q) rather than (M).

At the time *Wolpe* was decided, R.C. 3719.01(Q) provided:

"Marijuana" means all parts of any plant of the genus cannabis, whether growing or not, the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oils or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination.

-17-

*Wolpe*, at 51.

{¶43} In *Wolpe*, the Supreme Court of Ohio held that the exclusions set forth in the second sentence of R.C. 3719.01(Q) are only applicable when the substance at issue consisted *solely* of mature stalks, sterilized seeds, or the other excluded materials described in that statutory section. *Wolpe*, at 52. The Ohio Supreme Court arrived at that conclusion by observing that the legislature defined "marihuana" as "all parts of *any* plant of the genus cannabis, whether growing or not." *Wolpe*, at 51-52. (Emphasis *sic*.) Therefore, "marihuana," as initially defined, necessarily included those "parts" described in the exclusion sentence. *Id.* at 52. The Ohio Supreme Court reasoned that for the parts of the plant listed in the second sentence to be excluded from the definition of "marihuana" for weighing purposes, those parts must have already been separated from the non-excluded portions of the plant at the time at issue. *Id.*

{¶44} In the instant case, notwithstanding the specifics of the *Wolpe* decision, Baker contends that the fact that hemp is now also excluded from the statutory definition of marijuana means that the holding in *Wolpe* is no longer good law. We disagree.

{¶45} In *Wolpe*, the Ohio Supreme Court stated as follows when reaching its holding:

The obvious intent of the General Assembly in enacting the exclusion to the definition of "marihuana" in R.C. 3719.01(Q) was to recognize that the mature stalks, sterilized seeds, and by-products thereof have either legitimate, lawful uses or no unlawful use and thus should not be deemed contraband. By structuring R.C. 3719.01(Q) as it did, we conclude that the General Assembly additionally intended that, in order for certain parts of the marihuana plant to be excluded from the statutory definition, those parts must already have been separated from the non-excluded portions of the plant. This is true because *all* parts of the marihuana plant, according to the first sentence of R.C. 3719.01(Q), are considered to be marihuana. This necessarily includes mature stalks and sterilized seeds. It follows that the exclusion described in the second sentence of R.C. 3719.01(Q) applies only where the substance is found to consist *solely* of mature stalks, sterilized seeds, or otherwise excluded material.

As a consequence, the state has no burden to separate any statutorily excluded portions of the plant from the quantity of marihuana seized from appellant. The state produced the testimony of Detective William Hatfield of the Newark Police Department who testified that he conducted a microscopic examination of the substance seized from appellant in addition to performing a chemical test on a sampling of the substance. It was this witness' opinion, unchallenged by appellant, that the substance was marihuana.

Appellant's counsel cross-examined Hatfield and focused on Hatfield's failure to separate the mature stalks and sterilized seeds, if any, from the gross amount of the quantity seized from appellant. At no time did appellant suggest that the quantity seized from him consisted solely of excluded material. In our view, the state amply satisfied its burden of establishing that the substance was "marihuana" as defined by R.C. 3719.01(Q).

*Wolpe*, *supra*, at 52. (Emphasis *sic*.)

{¶46} In this case, upon reviewing the decision of the Supreme Court of Ohio in *Wolpe*, and also considering the binding nature of that precedent, we conclude that *Wolpe* is still valid law and that the trial court did not err in finding that the

holding in *Wolpe* is applicable here. While, since *Wolpe* was decided, the Ohio General Assembly has amended the definition of "marihuana" to exclude hemp, and has further separately defined hemp, we conclude based on the very precise language in *Wolpe* that the statutory exclusion of hemp from the definition of marijuana is only applicable when the substance at issue consists *solely* of the excluded material. In other words, while the list of materials now excluded by statute from the definition of marijuana may be broader than it was at the time *Wolpe* was decided, *Wolpe* clearly stands for the proposition that those exclusions are not applicable in a case, such as this one, when the substance at issue consists of plant material containing both marijuana *and* the excluded material.

{¶47} In this case, similar to the facts of *Wolpe*, the state produced the testimony of BCI expert Samuel Fortener, who testified that he conducted a chemical analysis of a representative sampling of the bags of plant material seized from Baker. Fortener testified that, based on his analysis, the substance analyzed was marijuana, meaning cannabis with a tetrahydrocannabinol, or THC, content of 2.57 percent, plus or minus .95 percent, calculated on a dry-weight basis, and that the overall weight of the marijuana provided for testing was 20,166.8 grams, plus or minus 2.1 grams. Fortener testified that the combined total weight was exclusive of any packaging material, and did not include the tenth bag of large stalks from which the remaining plant material had been cut off by investigators before

submission to BCI. Through the cross-examination of Fortener and other prosecution witnesses, while Baker's counsel focused on the failure, before weighing, to further separate out portions of the plant material that may have contained a lower percentage of THC, at no time did – or does – Baker suggest that the total quantity of plant material seized from him consisted solely of hemp or other excluded material.

{¶48} Thus, based on *Wolpe*, the State of Ohio had no burden to separate from the overall quantity of the plant material at issue any material that is statutorily excluded from the definition of "marihuana", including "hemp". Because of this, the trial court did not err in relying upon *Wolpe* in ruling that the defense was precluded from presenting expert testimony on, and from otherwise arguing, the "hemp theory" at trial with regard to the weight of the marijuana.

{¶49} With regard to Baker's specific claim in the first assignment of error as to the trial court's decision excluding his expert witness, biologist Frank Telewski, Baker contends that Telewski should have been permitted to testify for the defense regarding the weight and testing of the marijuana. However, Telewski did not perform any analysis of the plant material at issue. Rather, the defense argued that Telewski should be permitted to testify that there was no way to determine how much of the composite sample consisted of a material that, on its own, would be considered hemp. Telewski's testimony in that regard would have

focused on what he termed the "leaf/stem" ratio of the entire plant, on the theory that a larger fraction of leaves versus stems in the sample would have skewed the THC analysis higher and that, therefore, the total weight of the marijuana would have been less than the threshold weight of 20,000 grams charged in the indictment.

{¶50} The admissibility of expert testimony is a matter committed to the sound discretion of the trial court, and the trial court's ruling on such admissibility will not be overturned absent an abuse of that discretion. *Valentine v. Conrad*, 2006-Ohio-3561, ¶ 9, citing *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 616 (1998). To constitute an "abuse of discretion", a reviewing court must find that the trial court's decision was unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶51} Under Evid.R. 702(B), a witness may qualify to testify as an expert by reason of his or her specialized knowledge, experience, skill, training, or education, if the proposed expert testimony relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons.

{¶52} Generally, "courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth,* 82 Ohio St.3d 202, 207 (1998).

{¶53} Pursuant to Evid.R. 401, "relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

{¶54} Based upon the applicability of the decision of the Ohio Supreme Court in *State v. Wolpe*, *supra*, we find no abuse of discretion in the trial court's decision to exclude the testimony of Baker's expert. Pursuant to Evid.R. 401, the expert testimony sought by Baker to be introduced through Telewski was not relevant to the weight of the marijuana at issue. All parts of the plants that were weighed in this case were permissibly weighed pursuant to *Wolpe*. The fact that a *separate* material with a concentration of THC less than three-tenths per cent may be deemed hemp as defined in R.C. 928.01(C) was not relevant to the weighing of the plant material in this case, pursuant to *Wolpe*, as the plants at issue were not already separated into solely "excludable" and "includable" materials when found in Baker's possession.

{¶55} For those same reasons, and particularly due to the lack of relevance, the trial court also did not err in prohibiting defense counsel from arguing the "hemp theory" at trial, with regard to the issue of the marijuana's weight.

{¶56} In the first assignment of error, Baker also asserts that his due process rights were violated when BCI chemist Samuel Fortener "discarded the sample he

used to test the THC concentration of the plant material", leaving "no way for the Defense to independently test and verify that measurement."  Baker argues that the sample may have been exculpatory, based on the THC concentration of the sample.

**{¶57}** In making this due process claim based on the allegation that the state failed to preserve exculpatory evidence, Baker relies upon the decisions of the United States Supreme Court in *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).

**{¶58}** In *California v. Trombetta*, the United States Supreme Court held that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. at 488. "To meet this standard of constitutional materiality, * * * evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, *and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means*." *Id.*, at 489. (Emphasis added.)  In *Arizona v. Youngblood*, the United States Supreme Court distinguished between "materially exculpatory" evidence and "potentially useful" evidence, and held that the failure of the state to preserve potentially useful evidence was not a denial of due process absent the defendant showing bad faith on the part of the government. 488 U.S. at 57-58.

{¶59} In the instant case, it was undisputed by the State of Ohio that the composite sample of the marijuana plants that was analyzed by Samuel Fortener had been necessarily consumed as a result of that testing. As the trial court found in its November 8, 2023 judgment entry overruling Baker's motion to dismiss on this basis, Fortener testified that no evidence had been "destroyed but, rather, a small representative sample had been consumed by the testing." (11/8/23 Judgment Entry, Docket No. 78).

{¶60} However, it was also undisputed at that hearing, and Baker does not contest the fact on appeal, that over 20,000 grams (more than 44 pounds) of the marijuana plant material remained following Fortener's analysis. The record also reflects that the trial court granted Baker's motions for independent testing and re-weighing of that plant material.[2]

{¶61} On those facts, and in light of the relevant case law of the United States Supreme Court cited above, we conclude that the composite sample of the plant material that was by necessity consumed during the chemical analysis performed in this case did not constitute materially exculpatory or potentially useful evidence that was required to be preserved by the State of Ohio. Accordingly, we also find this claim of Baker's to be without merit.

{¶62} For all of the reasons stated, the first assignment of error is overruled.

---

[2]The record further reflects that the defense then did have the plant material, or a portion thereof, independently analyzed; however, the defense did not present the results of that independent analysis at trial.

*Second Assignment of Error*

**{¶63}** In the second assignment of error, Baker argues that his right to a fair trial was violated due to the trial court denying the jury a chance to review State's Exhibits 28 through 36, which were the large bags of marijuana admitted into evidence.

**{¶64}** With regard to this claim, the record reflects that shortly after the jury had retired to the jury room to deliberate, a written communication from the jury was delivered to the trial judge. The trial court then went on record with counsel, outside the presence of the jury, and the following exchange ensued:

> THE COURT: The court is convened today at this time in Case Number CR 21 603, State of Ohio versus Newlyn W. Baker. We have just dismissed the jury to go deliberate and almost immediately, like within two minutes, I get a note from the officer who is outside the door from one of the jurors.
>
> So I'm going to read. They put it on a piece of paper and we'll make this part of the record. The question isn't really a question, it's like a statement.
>
> It says "All bags of material in evidence."
>
> So that's what they're requesting. Waiting for – so how we usually handle this is I collectively – when there's a jury question, we decide as a collective group or I ask for input on how they want to respond to that and then we usually respond in writing to them kind of this is all you get. This is how we're going to do it. Yes or no.
>
> I did a quick amount of research waiting for everybody to get here. The law seems to say Ohio follows the majority rule that it is common practice to send exhibits admitted into evidence into the jury room. Doesn't appear to be a lot of reported cases on point.

In Ohio, it is within the discretion of the trial court to determine which exhibits should be sent to the jury room. Some dicta from a federal case says it's highly peculiar to withhold such things from jury scrutiny and somewhat inconsistent with the whole philosophy underlying the best evidence rule.

So we made them sit here for three days and said this is the evidence that we want you to consider. A little bit odd if we don't let them see it. Also, however, that's on one hand.

On the other hand, it's an illegal substance. I don't know.

MR. KOMORN [defense counsel]: It's not a controlled substance, Judge.

THE COURT: Oh, yeah, yeah, I got it. I thought you meant because of the timing of it.

So this is quite an informal – this is kind of the way that we do it, looking for input. If there's case law out there, I'll pull it quick and we'll let you talk about it.

I mean, the one idea I had – I mean, there's no law that's going to tell us how to do this. One idea I had was to everybody vacate the courtroom, leave it where it is, having the officer bring them in the courtroom so we're not moving the evidence all around. They never said that they wanted to open the bags.

MR. KOMORN: That's what I was going to say.

THE COURT: That's not what they're saying and we're not going to offer anything more than what they're asking for.

MR. KOMORN: Right. Because in this scenario that I was – before you – I agree. There's two different, I mean, there's two layers to this. One is being in the room with those bags. The second one is being in the room with the bags and opening them up and examining them.

THE COURT: Yes,

MR. KOMORN: We're not at Number 2 yet.

THE COURT: Right.

MR. KOMORN: But why wouldn't they? Why would they want this stuff – they've been sitting in the same room with these bags for three days now, they want to see what's in them.

So we should probably address that, too. Because that will be back, you know, within two seconds.

THE COURT: Okay. Anybody have an opinion of how they want to do it?

Mr. Burkard, do you have an opinion?

MR. BURKARD [prosecutor]: You know, I think they're entitled to see and touch just like a photograph. I, you know, kind of concerned it is a controlled substance, but just for having them come in here with a deputy to look and see and submit a bag around, I guess I would have no objection to that. That might be the way to go.

THE COURT: You want to start there or you want to address the issue of opening the bag?

Your opinion would be let them come in here with an officer and view?

MR. BURKARD: And view.

THE COURT: And look at whatever they want to look at?

MR. BURKARD: Yes.

MR. KOMORN: As far as that, I don't have an issue with that, the bags as they stand. But the other issue and I think it will happen – I mean, if you want to wait, we can wait till it happens.

THE COURT: Let's do it in baby steps. I mean, it does take a little bit more time on all of our parts, but I think if we're going to – let's focus on what they're asking for.

So my response is going to be –

MR. KOMORN: Don't open the bag.

THE COURT: The bags of evidence will remain in the courtroom, but you will be permitted to view them in the bag. I can't think and write at the same time. The bags of State's Exhibits 28 through 36, marked and admitted in the case, will remain in the courtroom. You can view the bags in the presence of an officer.

MR. BURKARD: Masks required?

THE COURT: No, we're not going there.

You can view the bags in the presence of an officer. So that's what I'm going – we're going to type that up real quick, we're going to send that back into them. So I'm going to have everybody have to go leave the courtroom.

MR. BURKARD: Your Honor, are we going to allow them to handle the bags?

THE COURT: They can touch them, they can do whatever. I mean, if they want to open them up, that's another question, that's a whole different question.

(Tr., 843-848).

{¶65} The record then reflects that a break was taken and the courtroom was vacated. The trial court's written response to the jury, which is included in the record on appeal, reads as follows:

Exhibit Nos. 28-36, marked and admitted as evidence in the case will be in the courtroom for viewing in the presence of a law enforcement officer.

(Docket No. 198).

{¶66} Nothing further is contained within the trial court record with regard to the jury's request relating to the bags of marijuana evidence, or the trial court's handling of that request.[3]

{¶67} On appeal, Baker argues that the trial court erred in its handling of the jury's request. Specifically, Baker asserts "with the actual composition of the plant material and the weight of the marijuana being such a central issue in the case, there can be no doubt that the jury wanted to view the contents of the bags."

{¶68} As this Court noted in *State v. Fellows*, 47 Ohio App.2d 154 (3d Dist. 1975), "[i]t is common practice to send exhibits admitted into evidence to the jury room. See 52 Ohio Jurisprudence 2d 554, Trial, Section 70." *Fellows*, at 158-159. "Once in the jury room, the exhibits may be examined by the jury to any extent it desires." *Id*., at 159.

{¶69} However, "[s]ending properly admitted evidence into jury deliberations rests within the sound discretion of the trial judge." *State v. McGuire*, 80 Ohio St.3d 390, 396 (1997), citing *State v. Clark*, 38 Ohio St.3d 252, 257 (1988). Thus, when a jury asks to see an exhibit, it is within the trial court's discretion to

---

[3] In his merit brief on appeal, Baker asserts, "After the trial, it came to light that the jury did, in fact, want to look inside the bags. The jurors asked Deputy Klein to do so. Instead of passing the question on to the trial court or advising the jurors to send that request to the trial court, Deputy Klein unilaterally denied their request." As this factual claim relates to a matter outside the record, this Court is unable to consider it on direct appeal as we may only consider matters contained within the record. *See, e.g., State v. Scott-Hoover*, 2004-Ohio-4804, ¶ 18 (3d Dist.).

grant or deny that request. *State v. Carey*, 2007-Ohio-3073, ¶ 21, fn. 8 (8th Dist.), citing *State v. Bethel,* 2006-Ohio-4853; *State v. McGuire*, *supra*; *State v. Clark*, *supra*. To constitute an abuse of discretion, a reviewing court must find that the trial court's attitude was unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶70}** Additionally, the failure to object to an action taken by a trial court at the time the action was taken, when it could have been avoided or corrected by the trial court, generally waives the issue on appeal in the absence of plain error. *See, e.g.*, *State v. Williams*, 51 Ohio St.2d 112, 117 (1977); Crim.R. 52(B). "To qualify for plain-error relief, the appellant must establish: (1) occurrence of an error, i.e., a deviation from a legal rule; (2) the error was plain, i.e., it was an obvious defect in the trial proceedings; and (3) the error affected the appellant's substantial rights, meaning the error 'must have affected the outcome of the trial.'" *State v. Peters*, 2023-Ohio-4362 ¶ 34 (3d Dist.), quoting *State v. Morgan*, 2017-Ohio-7565, ¶ 36. We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, paragraph three of the syllabus (1978).

**{¶71}** In the instant case, when determining how to handle the jury's request relating to the bags of plant material in evidence, the trial court interpreted the written communication to mean that the jury was asking to view the bags of

material, which is what the note said. After consultation with counsel, the trial court granted the jury's request. The record also specifically reflects that the trial court was not opposed to providing the jurors with an opportunity to more closely review, or even handle, the contents of the bags, should such a request be made. The trial court's decision to narrowly construe the request and initially take a comparatively safe course of action in response to the request was reasonable and was not arbitrary or unconscionable under the circumstances, particularly as the bags contained over 44 pounds of a controlled substance, and the possibility of the jury handling the bags' contents, or having unsupervised access thereto, posed an obvious concern.

**{¶72}** Notably, the record also reflects that defense counsel offered no objection to the trial court's handling of the matter. To the contrary, the record establishes that defense counsel acquiesced in the trial court's handling of the jury's written communication.

**{¶73}** In reviewing this assignment of error for plain error, we find for the reasons stated that no error occurred and, further, that no prejudice resulted from the manner in which the trial court handled the jury's request. Baker asserts on appeal that the actual composition of the plant material was a central issue in the case with regard to the marijuana's weight, and therefore Baker argues that the jury should have been able to handle the plant material in order to review its composition. However, in light of our resolution of the first assignment of error,

*supra*, and the applicability of the holding of the Ohio Supreme Court in *State v. Wolpe*, the actual composition of the plant material in the bags was not the critical issue that Baker claims it to have been. Pursuant to *Wolpe*, *supra*, as the state had no burden to separate out any statutorily excluded portions of the plants from the overall quantity of marijuana prior to weighing it, the composition of the plant material was not a dispositive factor with regard to the issue of the marijuana's weight. Accordingly, we conclude that the trial court's handling of the jury's request did not affect Baker's substantial rights.

{¶74} As the trial court did not abuse its discretion with regard to its handling of the jury's request concerning the evidence at issue and, moreover, as Baker has failed to establish that plain error resulted with regard to this claim, the second assignment of error is overruled.

*Third and Fifth Assignments of Error*

{¶75} In the third assignment of error, Baker argues that his conviction for Possession of Marihuana was not based on sufficient evidence. In the fifth assignment of error, Baker argues that his conviction for Possession of Marihuana was against the manifest weight of the evidence. As the third and fifth assignments of error both require a review of the evidence presented at trial in light of the statutory elements of the crime at issue, albeit with differing standards of review, we shall jointly address those assignments of error.

{¶76} It is well established that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, paragraph two of the syllabus (1997).

{¶77} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. "'In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact.'" *State v. Williams*, 2024-Ohio 2307, ¶ 21 (3d Dist.), quoting *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

{¶78} By contrast, when determining whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, *supra*, at 387. In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether,

in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must still allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. Stewart*, 2023-Ohio-253, ¶ 11 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

**{¶79}** In the instant case, Baker was convicted on Count 2 of Possession of Marihuana in violation of R.C. 2925.11(A), which provides in relevant part that "[n]o person shall knowingly * * * possess * * * a controlled substance * * *." Count 2 of the indictment further alleged that the controlled substance possessed by Baker was marijuana, in a weight equal to or exceeding 20,000 grams.

**{¶80}** On appeal, Baker argues in the third assignment of error that the evidence at trial was insufficient to prove that he knowingly possessed the marijuana at issue. Similarly, in the fifth assignment of error, Baker asserts that his conviction was against the manifest weight of the evidence as to the issue of whether he knowingly possessed the marijuana.

{¶81} R.C. 2901.22(B) defines the culpable mental state of "knowingly", and provides:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶82} "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "The issue of whether a person charged with drug possession knowingly possessed a controlled substance 'is to be determined from all the attendant facts and circumstances available.'" *State v. Brooks*, 2012-Ohio-5235, ¶ 45 (3d Dist.), quoting *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998).

{¶83} "Possession of drugs can be either actual or constructive." *State v. Bustamante*, 2013-Ohio-4975, ¶ 25 (3d Dist.). "A person has 'constructive possession' if he is able to exercise dominion and control over an item, even if the individual does not have immediate physical possession of it." *Id.*, citing *State v. Hankerson*, 70 Ohio St.2d 87, syllabus (1982). "For constructive possession to

exist, '[i]t must also be shown that the person was conscious of the presence of the object.'" *Id.*, quoting *Hankerson* at 91.

**{¶84}** "'Although a defendant's mere proximity to drugs is in itself insufficient to establish constructive possession, proximity to the drugs may constitute some evidence of constructive possession.'" *State v. McClain*, 2020-Ohio-1436, ¶ 46 (3d Dist.), quoting *State v. Brown*, 2009-Ohio-5390, ¶ 20 (4th Dist.). "'Therefore, presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession.'" *Id.*

**{¶85}** "'[T]he State may prove * * * constructive possession of contraband by circumstantial evidence alone.'" *McClain*, at ¶ 45, quoting *Bustamante*, *supra*, at ¶ 25.

**{¶86}** As to the evidence presented at trial in the instant case, Baker did not dispute the fact that he owned the real property upon which the marijuana was found, nor did he dispute the evidence establishing that he also resided there at, and prior to, the time that the marijuana was discovered and seized by law enforcement. In addition to that evidence, and contrary to Baker's argument on appeal, there was an abundance of circumstantial evidence presented at trial to prove that Baker had knowledge of the marijuana being grown behind his home.

{¶87} Such evidence included, but was not limited to, evidence that there was a locked gate across the driveway at the front entrance to the property when investigators arrived to serve the search warrant, and that marijuana, drug paraphernalia, and scales were found inside Baker's residence. The very large, nearly tree-like, size of the marijuana plants, as well as the size and nature of the open-air enclosure in which ten of those huge plants were growing is also evidence tending to establish that Baker had knowledge of the marijuana plants, as – given the size, style, and location of the enclosure – it is reasonable to infer that Baker was aware of the structure and its contents, since he owned and lived on the property. Additionally, one rather large marijuana plant was growing in plain view outside of that enclosure.

{¶88} Baker's property was described at trial as being in a rural area of mainly farmland, with a fairly flat terrain, and the enclosure was located to the rear of Baker's home, with the numerous, extremely large, and obviously well-tended marijuana plants growing inside of it. Photographs of the roofless enclosure in which the ten marijuana plants were growing reflected that the sides of the enclosure were constructed of wood fencing-type panels, with metal sheeting run around the tops of the sides to add extra height to the walls of the enclosure. That unusual construction, when considered along with the marijuana plants found growing inside of the enclosure, supports the conclusion that the enclosure was built on the property

for the specific purpose of growing marijuana inside of it, particularly in the absence of other conceivable normal uses for such a structure. The evidence at trial also established that an extension cord ran from a receptacle in the electrical meter box on the side of Baker's residence, across Baker's property, and then into the enclosure at the rear of the property. Near the enclosure, there were also watering tanks on the premises, and gardening supplies – including grow lights – were being stored in two of the vehicles parked on Baker's property.

{¶89} Upon considering all of that rather open and obvious evidence of a large marijuana cultivation operation on the premises, a trier of fact could reasonably conclude that Baker was conscious of the presence of the marijuana on his property and that, as the owner and occupant of the premises, he exercised dominion and control over the marijuana. Particularly when examining the evidence in a light most favorable to the prosecution, we conclude that the State of Ohio produced sufficient evidence to support Baker's conviction. The third assignment of error is therefore overruled.

{¶90} With respect to the manifest-weight claim in the fifth assignment of error, Baker argues that, when considering the testimony given by defense witness John Moore, the weight of the evidence establishes that Jamie Gandy was growing marijuana on Baker's property without his knowledge. We disagree.

**{¶91}** Upon reviewing Moore's testimony, this Court finds that no aspect of that testimony – if believed – served to call into question, much less outweigh, all of the evidence outlined above that went toward proving Baker's knowledge of the marijuana plants on his property. Put another way, assuming arguendo that Gandy (or even a third, unknown person) was the person who planted and cared for the marijuana, the testimony provided by Moore did not rebut or outweigh the evidence serving to establish Baker's knowledge and, therefore, his dominion and control over, the marijuana being cultivated on the property owned by him. Moreover, as to the weight to be given Moore's testimony, we note that the jury was able to see, hear, and evaluate Moore's testimony and was free to believe or disbelieve any or all of that testimony. *State v. Williams*, 2024-Ohio-2307, ¶ 27 (3d Dist.), citing *State v. Shockey*, 2024-Ohio-296, ¶ 24 (3d Dist.). A verdict is not against the manifest weight of the evidence just because the jury chose to believe the state's witnesses rather than the defense's version of the events. *State v. Hooper*, 2022-Ohio-2990, ¶ 29 (3d Dist.).

**{¶92}** In summary, following this Court's independent review of the record and weighing of the evidence and all reasonable inferences therefrom, we conclude that this is not the exceptional case where the evidence weighed heavily against conviction, nor is there any indication that the jury lost its way in finding Baker

-40-

guilty of Possession of Marihuana in Count 2. Accordingly, the fifth assignment of error is also overruled.

*Fourth Assignment of Error*

{¶93} In the fourth assignment of error, Baker asserts that the trial court erred in failing to grant him a new trial, based on Baker's claim of juror misconduct.

{¶94} As detailed above, on December 6, 2024, Baker filed a motion for a new trial pursuant to Crim.R. 33, based in part on a claim of juror misconduct. In support of that claim, Baker alleged that Juror #1 was a reserve officer with the Paulding County Sheriff's Office and that the juror had failed to disclose that affiliation during voir dire. Baker asserted that the juror's alleged nondisclosure, and the fact that the juror was not excused from serving on the jury, resulted in prejudice to Baker.

{¶95} On January 2, 2025, the trial court filed a judgment entry overruling Baker's motion for a new trial. In that judgment entry, the trial court found that Baker's claim of nondisclosure and resulting prejudice was not supported by the record, nor by the applicable law.

{¶96} Motions for a new trial are governed by Crim.R. 33. Pursuant to Crim.R. 33(A)(2), "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights: * * * (2) [m]isconduct of the jury, prosecuting attorney, or the witnesses for the

-41-

state[.]" Pursuant to Crim.R. 33(E)(5), a motion for a new trial shall not be granted on any basis "unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial."

**{¶97}** The decision to grant or deny a motion for a new trial is addressed to the sound discretion of the trial court and is not reversible on appeal absent an abuse of discretion. *State v. Fisher*, 2021-Ohio-3788, ¶ 16 (3d Dist.). See also *State v. Schiebel*, 55 Ohio St.3d 71, paragraph one of the syllabus (1990). The term "abuse of discretion" implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶98}** "The right to a trial by an impartial jury lies at the very heart of due process." *Smith v. Phillips*, 455 U.S. 209, 224-225 (1982), citing *Irvin v. Dowd*, 366 U.S. 717, 721-722 (1961). Pursuant to the Sixth and Fourteenth Amendments, the United States Constitution guarantees that a criminal defendant has a right to an impartial, unbiased jury. *State v. Froman*, 2020-Ohio-4523, ¶ 49. Similarly, Section 5, Article I of the Ohio Constitution guarantees the right to a trial by jury, and this right includes by implication the right to a jury composed of unbiased, unprejudiced jurors. *State v. Glass*, 2024-Ohio-4535, ¶ 41 (3d Dist.).

**{¶99}** Voir dire is the primary process that "serves the purposes of allowing the court and the parties to identify and remove jurors to ensure an impartial jury." *Froman*, *supra*, at ¶ 49. "Thus, when a juror who has exhibited actual bias against a

defendant is seated on the jury, the defendant's Sixth Amendment right to an impartial jury has been violated." *Id.*

{¶100} To establish a constitutional violation where a claim of jury misconduct is based on a juror's concealment of information or failure to disclose potential bias, the defendant has the burden to establish that a seated juror was not impartial. *State v. Williams*, 79 Ohio St.3d 1, 4 (1997). In *Grundy v. Dhillon*, 2008-Ohio-6324, the Supreme Court of Ohio set forth the test to be applied when reviewing a juror's alleged misrepresentations during voir dire. In *Grundy*, the Ohio Supreme Court held that "[t]o obtain a new trial in a case in which a juror has not disclosed information during voir dire, the moving party must first demonstrate that a juror failed to answer honestly a material question on voir dire and that the moving party was prejudiced by the presence on the trial jury of a juror who failed to disclose material information." *Id*., at paragraph one of the syllabus.

{¶101} A court may infer bias if it finds that a juror deliberately concealed or failed to disclose information but, if the concealment was unintentional, the appellant must show that the juror was actually biased. *Williams*, *supra,* at 4. "'The law presumes proper conduct on the part of the jury.'" *State v. Pryor*, 2024-Ohio-3154, ¶ 64 (3d Dist.), quoting *State v. Sealey*, 2019-Ohio-3692, ¶ 35 (2d Dist.).

{¶102} With regard to the claim of juror misconduct in the instant case, we note as an initial matter that the affidavit of Paulding County Sheriff Jason Landers,

which was submitted by the State of Ohio in support of its response to Baker's post-trial motion alleging juror misconduct, served to refute Baker's allegation that Juror #1 was a reserve deputy with the Paulding County Sheriff's Office. As reflected by that affidavit, Juror #1 had never been commissioned by the Paulding County Sheriff's Office as a deputy or a reserve deputy but, rather, had previously been employed, nearly a decade prior to the trial, as a civilian employee at the Paulding County Jail.

{¶103} More importantly, while Baker claims on appeal that Juror #1 failed to honestly answer questions during his individual voir dire that would have disclosed his prior affiliation with law enforcement, a review of the record reflects that Baker's assertion in this regard is also not accurate.

{¶104} The record of the jury selection process actually reflects that, following the State of Ohio's exercise of its first peremptory challenge, Juror #1 was then moved into the jury box to be individually questioned by the trial court and counsel. The trial court asked Juror #1 if he had been able to hear all of the initial questions asked by the court at the beginning of voir dire, and the juror answered, "yes." (Tr., 125). The trial court then asked if Juror #1 had any responses to those questions, and the juror answered that he did not. Here, it is important to note that none of the questions asked by the trial court at any point during the voir dire process related to employment by, or dealings with, a law enforcement agency.

{¶105} After the trial court finished its questioning of Juror #1, the prosecutor then asked several questions of the prospective juror. Only one of those questions related to the topic of law enforcement, and that question was whether the prospective juror's experience with law enforcement in that county had been positive, to which Juror #1 answered, "yes." (Tr., 126). After the prosecution passed Juror #1 for cause, defense counsel then asked a number of questions of the prospective juror. Only one of the questions posed by defense counsel related to law enforcement, and that question was whether the prospective juror believed that police misconduct is something that occurs, to which Juror #1 answered, "I'm sure it exists." (Tr., 129). During that individual voir dire, when asked how he was employed at that time, Juror #1 stated that he works as a highway inspector and that, pursuant to that employment, he had become aware that people may try to mislead him for various reasons. As a result, Juror #1 indicated that he would determine the credibility of witnesses based on the evidence presented. During defense counsel's questioning of Juror #1, the record also reflects that the juror stated he felt it was his civic duty to serve as a juror, that he would follow the law given to the jury by the trial court, that the presumption of innocence means that a person is innocent until proven guilty, and that the state is required to prove a defendant's guilt beyond a reasonable doubt.

{¶106} In reviewing the record relating to Baker's claim here, we further note that neither the prosecutor nor defense counsel questioned any prospective juror about past or present employment by a law enforcement agency. During voir dire, counsel also did not pose any questions to any the prospective jurors on the topic of law enforcement, or dealings with law enforcement, beyond the same questions that were asked specifically of Juror #1.

{¶107} Following this Court's thorough review of the voir dire proceedings in this case, we conclude that the record simply does not support Baker's claim that Juror #1 deliberately concealed or failed to disclose material information, nor has Baker established any credible claim of actual bias on the part of that juror. Thus, the trial court did not abuse its discretion in overruling Baker's motion for a new trial on the basis of alleged juror misconduct.

{¶108} The fourth assignment of error is overruled.

*Conclusion*

{¶109} Having found no error prejudicial to the defendant-appellant, Newlyn Baker, in the particulars assigned and argued, the judgment of conviction and sentence entered in the Paulding County Court of Common Pleas is affirmed.

***Judgment affirmed***

**MILLER and WILLAMOWSKI, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Juergen A. Waldick, Judge

_____
Mark C. Miller, Judge

_____
John R. Willamowski, Judge

DATED:
/jlm